COMMONWEALTH *vs.* NATHAN DESATNICK.

Worcester.    January 9, 1928. — February 28, 1928.

Present: BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Homicide. Accessory. Evidence,* Presumptions and burden of proof, Inference, Circumstantial. *Venue. Practice, Criminal,* Assignment of errors in proceedings under Sts. 1925, c. 279; 1926, c. 329, § 1: transcript of evidence.

An inference by a jury before whom an indictment is being tried, if it is based on facts directly sworn to, may warrant a conviction although it is not the only necessary one; it is sufficient if it is reasonable and not forbidden by some special rule of law or unwarranted because too remote according to the ordinary course of events.

The jury at the trial of an indictment are at liberty to use their general knowledge in determining what inferences from facts directly sworn to are established beyond a reasonable doubt.

Facts properly inferred by a jury from facts directly sworn to are as effectually proved as if directly testified to.

An accessory before the fact to a felony may be indicted, tried and punished in the county where the principal felon may be indicted and tried, although the procuring of the felony took place elsewhere.

Although the defendant, at the trial of an indictment charging him with being an accessory to the murder of his illegitimate child, testified that he gave the child to another man to be taken to New York to be cared for, and that he did not know what became of the child, the defendant's entire conduct, together with all the evidence and inferences which properly might be drawn therefrom was *held* to have warranted a finding that the second man drowned the child and that the defendant was an accessory before the fact who had hired him to do so; and a motion that the jury be ordered to return a verdict of not guilty properly was denied.

Unless the defendant's testimony were discredited, there was nothing in the evidence at the trial above described to support the defendant's contention that there was no such person as the second man to whom the defendant could be an accessory.

Where the only exception saved by the defendant at the trial of an indictment charging the defendant with being an accessory before the fact to murder in the first degree, was to the denial of a motion that the jury be instructed to return a verdict of not guilty on all the evidence, nothing more than the evidence itself should be included in the transcript of evidence presented to this court under Sts. 1925, c. 279; 1926, c. 329, § 1.

INDICTMENT, found and returned on August 17, 1927, charging the defendant with being an accessory before the fact to murder in the first degree.

In the Superior Court, the defendant was tried before *Donahue*, J., who, at the close of the evidence, denied the defendant's motion that the jury be instructed to return a verdict of not guilty. The defendant duly excepted to this denial, and claimed an appeal under Sts. 1925, c. 279; 1926, c. 329, § 1, making the following assignment of errors:

"1. There was no evidence that the defendant incited, procured, aided, counselled, hired or commanded Harry Balkan, alias John Doe, to commit the said murder.

"2. The entire case of the Commonwealth was based on the theory that the defendant himself, in person, committed the murder and that there was no such person, as Harry Balkan, to whom the defendant could be an accessory."

Material evidence is described in the opinion.

*G. R. Stobbs*, (*H. H. Hartwell* with him,) for the defendant.

*C. B. Rugg*, District Attorney, (*E. G. Norman*, & *H. W. Brown*, Assistant District Attorneys, with him,) for the Commonwealth.

CARROLL, J. The defendant was found guilty of "procuring murder in the first degree as an accessory before the fact," under an indictment charging that "John Doe, whose other and true name and a more particular description of whom is to said Jurors unknown . . . [on June 5, 1927] did assault and beat Stella Goldberg otherwise known as Stella Desatnick otherwise known as Marion Desatnick, by drowning her in Lake Quinsigamond . . . . And that Nathan Desatnick, before said murder was committed did incite, procure, aid and counsel, hire or command said John Doe, the said murder to do and commit." With this indictment there was tried another indictment against the defendant as principal in the same murder. On this indictment there was a verdict of not guilty.

The single exception of the defendant is to the refusal of the trial judge on his motion to instruct the jury to return a verdict of not guilty. The assignment of errors alleges as the basis of the exception the absence of evidence that the

defendant incited, procured, aided or counselled, hired or commanded Harry Balkan, alias John Doe, to commit the said murder; that the case of the Commonwealth rested on the theory that the defendant himself committed the murder and there was no such person as Balkan to whom the defendant could be an accessory.

The dead body of Stella Desatnick was found about six o'clock on the evening of June 6, 1927, in Lake Quinsigamond on the Shrewsbury side, about one half mile from the bridge between Worcester and Shrewsbury. Stella Desatnick was born January 30, 1927. The defendant was her father, her mother was Anna Goldberg. The defendant and Anna Goldberg were married on May 2, 1927. There was evidence from a social worker who talked with the defendant a short time after the birth of the child that he said "he thought it would be the best thing to give the baby away, so Anna could return home"; that "his mother advised him to give the baby away and he could continue to keep company with Anna." On February 14, 1927, the defendant and Anna Goldberg brought the baby to the home of Mrs. Jackson at Arlington Heights, where she was to be cared for. She remained with Mrs. Jackson until June 5, the defendant paying Mrs. Jackson from time to time for the care of the child.

The defendant testified that about ten days before June 5 he met Balkan and talked with him about taking the child to New York, and later arranged with Balkan to meet him at Scollay Square, Boston, after nine o'clock on the night of June 5; that on June 5, he left his home between ten and eleven o'clock in the morning, telling his wife he would be away on business, and went to the rooms of a social club at the West End, Boston, where he remained until he went to a moving picture theatre; that after leaving the theatre he returned to the vicinity of the social club, where his automobile was standing, and drove to Scollay Square; that there he met Balkan about a "Quarter past nine or half-past 9," and drove to the home of Mrs. Jackson; that on the journey he gave Balkan $25 to pay his fare to New York; that Balkan said to him that as soon as the baby was placed in a home in New York he would let the defendant know "how much

the board . . . [would] be for the baby." In his statement
to the police officers the defendant said he let Balkan "off
just before they got to the house, around the corner," that
his reason for this was "Mrs. Jackson might think they were
going to kill the baby if she saw two of them"; and he testi-
fied that he asked Balkan to wait for him because "If I had
gone up with him to Mrs. Jackson's house I probably
wouldn't have got the baby . . . it wouldn't seem very
good to her that I had a strange fellow with me and come
for the baby."

The defendant said to Mrs. Jackson that he intended to
go to New York with his wife and the baby on the midnight
train; that he was going to start housekeeping with a cousin
of his and that they desired to take the baby with them.
The baby was placed in a sleeping bag with her hands inside
the bag, and before leaving the Jackson home she was given
castor oil and milk. While the baby was being dressed, the
defendant excused himself, saying he had to go to Sylvia
Street, but would "be back in about 10 minutes." He ad-
mitted he did not go to Sylvia Street. He returned to the
Jackson home with an automobile, leaving Balkan and telling
him he "would be right back, and . . . [Balkan] stood there
waiting for . . . [him]."

There was evidence that the night was cold, there had been
a thunder storm, and there was a strong wind when the de-
fendant took the baby from the Jackson house about eleven
o'clock; that he placed her on the floor between the rear and
front seats of the open automobile, and Mrs. Jackson pro-
tested at this treatment and offered to go with him to the
station; that finally the child was placed in the front seat at
the defendant's side. The defendant testified that Balkan
was "picked . . . up at the foot of the hill"; that at the East
Cambridge court house, about fifteen minutes after leaving
the Jackson house, Balkan asked him to stop, saying, "It is
kind of early to go to the train and sit around at the South
Station; I will go in my friend's house and hang around until
train time"; that "he was going to take the midnight train."
The defendant admitted he did not know where the child
was to be placed in New York and did not know at what

address in New York Balkan could be found.   He knew that Balkan had been arrested on at least two occasions.   He had not seen or heard from Balkan since June 5.   The defendant testified he had not written to find out where the child was.

On August 5, 1927, after the child had been identified by Mrs. Jackson, a police officer went to the home of defendant's father.   The defendant was told that the officers "were checking up on a baby that had been boarding with a Mrs. Jackson, and had information that he was the father of that baby."   He said he was.   He was asked where the baby was. He replied, "In New York State."   He was asked where in New York, and replied, "I have got the address here in my pocket."   He made a search through his clothes and finally said, "I will tell you the truth . . . I gave the baby away . . . [to] a fellow named Balkan."   He was asked if he had heard from Balkan.   He said, "No," and, when asked where the baby was, said, "It ought to be in New York State; as far as I know, it is."

When the body of Stella was found on June 6, she was fully clothed and was in the sleeping bag, dressed in the same manner as she was on leaving the Jackson home the night before.   The autopsy showed that the child died from drowning, and from the appearance of the milk and castor oil in the stomach, death occurred within three or four hours after the food and oil had been taken into the stomach.

On this record there was no error of law in refusing the defendant's motion for a directed verdict.   There was evidence for the jury that Stella Desatnick was murdered by drowning on the night of June 5 or early in the morning of June 6.   It was impossible for a child of her age to have gone voluntarily from Boston to Lake Quinsigamond.   Her hands were inside the sleeping bag.   There were no marks of violence.   From the place where the body was found and all the circumstances related in the evidence, it was for the jury to say whether Stella Desatnick came to her death by drowning and whether the crime of murder was committed. There was nothing indicating that the drowning was accidental or that the child had been merely abandoned.   From

her appearance and condition it could be found that she had been murdered. The weight and importance to be given to the evidence were for the jury to consider. *Commonwealth* v. *Wood*, 261 Mass. 458. "When a material fact is not proved by direct testimony, but is left to be inferred from the facts directly sworn to, the inference need not be a necessary one. There is a case for the jury, unless the inference either is forbidden by some special rule of law, or is declared unwarranted because too remote, according to the ordinary course of events. If there is a case for the jury, they are at liberty to use their general knowledge in determining what inferences are established beyond a reasonable doubt; and the facts inferred by them are as properly proved as if directly testified to." *Commonwealth* v. *Doherty*, 137 Mass. 245, 247. *Commonwealth* v. *Best*, 180 Mass. 492, 497. *Commonwealth* v. *Caruso*, 251 Mass. 362. *Commonwealth* v. *Sacco*, 255 Mass. 369. It was not essential that the inference drawn should be the only necessary inference. It was enough if the inference were reasonable. It was for the jury to say whether the defendant was an accessory before the fact; and if there was any evidence from which this conclusion could be drawn, the verdict must stand. *Commonwealth* v. *Asherowski*, 196 Mass. 342. *Commonwealth* v. *Merrick*, 255 Mass. 510.

An accessory to a felony before the fact may be indicted, tried and punished in the county where the principal felon may be indicted and tried, although the counselling or procuring the commission of the felony was committed within or without the Commonwealth or on the high seas. G. L. c. 274, § 3.

Shortly after the birth of the baby the defendant manifested a disposition to dispose of her, or "give the baby away." He was anxious to avoid the disgrace of being the father of an illegitimate child. He had arranged with Balkan according to his testimony to remove the child from this Commonwealth, so that she might be adopted. During the four months the child was with Mrs. Jackson he visited her but four times, including the first and last visits. When he took the child away on a cold night, he placed her on the

floor of an open automobile, between the front and rear seats. The defendant's testimony concerning Balkan — meeting him at night; taking him to Arlington; hiding him from the Jacksons as the jury might find so that no one would know that Balkan was with him; leaving a child of tender age in the custody of a man who he knew had been arrested, without any intimate knowledge of his business or character, to be taken to New York to some home of which he knew nothing; leaving the child in the custody of this man at night on the streets of Cambridge, which the jury might find was a part of the plan to conceal the identity of Balkan, at a place whence the jury might find it was easy for Balkan to depart for Lake Quinsigamond without being identified and kill the child by drowning her — warranted the jury in finding that the defendant was guilty.   The jury, in other words, could believe the defendant's testimony that he met Balkan and left the child in his custody and could refuse to believe the testimony of the defendant that he at any time intended that Balkan should take the child to New York.   They could find that he intended to rid himself of the child and for this purpose hired Balkan to drown her.   These facts, taken in connection with the fact that he concealed from his wife and family the whereabouts of the child and the information that he was going to abandon her; his indifference about the child's home or the residence of Balkan; his falsehoods to Mrs. Jackson about leaving for New York in company with his wife; his entire conduct on June 5; his attempted explanations of his falsehoods; his statement to the police officers that he had the address of the child; his indifference as to the child's whereabouts from June 5 to August 5, no effort being made to learn where she was; his complaints about the payment of $10 a week to Mrs. Jackson, leaving him with but $15 to support his wife and himself, his wife being at the time pregnant; and his statements that Mrs. Jackson "was right after her $10 every week and never offered to take . . . [the child] for nothing . . . I was only getting $25 a week . . . and if I paid her $10 a week that only left me fifteen . . . you know how much you can do on $15 a week"; his indifference to the child's welfare from her birth to her death; his attempt to

divert suspicion from himself by his falsehoods — were evidence from which his guilt could be inferred.

After he left the child in the care of Balkan he made no disclosure to his wife of his doings on the night of June 5 until about a week after that date. He made but a slight attempt even if his testimony were believed to locate Balkan and to find out whether the plan of taking the child to New York had been carried out. He did not even go to East Cambridge to locate the people to whom Balkan was to go before leaving on the train. He never wrote to Balkan; he made no inquiries at the police station and did nothing which a father interested in the welfare of a child would have done if his child was to be taken to another city. Balkan had no interest in taking the life of the child unless instigated by the defendant. The defendant's entire conduct, together with all the evidence, gave the jury the right to find that Balkan, advised and procured by the defendant, committed the crime, and that the defendant was an accessory before the fact, who had hired Balkan to drown the child. *Commonwealth,* v. *Smith,* 163 Mass. 411, 418. *Commonwealth* v. *Devaney,* 182 Mass. 33, 35, 36. *Commonwealth* v. *Spezzaro,* 250 Mass. 454, 457. *Commonwealth* v. *Gentile,* 255 Mass. 116, 118.

There is nothing in the evidence to support the defendant's contention that there was no such person as Balkan to whom the defendant could be an accessory, unless the defendant's testimony is discredited. The defendant testified regarding Balkan, and the degree of credence to be given his testimony on this issue was for the jury. The question of the defendant's guilt was, as we have said, one of fact; and there were sufficient facts upon which his guilt could be found.

The Commonwealth requests an interpretation by this court of the scope of the phrase "Transcript of the Evidence," in St. 1925, c. 279; St. 1926, c. 329, § 1. In the so called transcript of evidence there is included the proceedings during the empanelling of the jury, the opening addresses of the attorneys for the Commonwealth and the defendant, and their final arguments, with the charge to the jury. In a case of this kind, where the only question is the accuracy of the ruling of the court in refusing to order a verdict of not

guilty on all the evidence, nothing should be included in the transcript of evidence except the evidence itself. The preliminary matters already referred to, the opening and closing arguments of counsel, and the judge's charge should be omitted. These matters were irrelevant to the issues presented by the defendant's appeal and assignment of errors.

*Exceptions overruled.*

*Judgment on the verdict.*