COMMONWEALTH *vs.* MYER GOLDENBERG.

Suffolk.    November 1, 1943. — November 29, 1943.

Present: FIELD, C.J., LUMMUS, QUA, COX, & RONAN, JJ.

*Homicide. Evidence*, Presumptions and burden of proof.

A finding that a woman was stabbed to death by the defendant as she sat in his automobile stopped in a public park and not, as asserted by the defendant, by an armed robber who disappeared after assaulting and robbing the defendant and killing the woman, and a verdict of guilty of murder in the second degree were warranted by testimony of the medical examiner, evidence that, after knowledge of the indictment, the defendant attempted suicide, and other evidence in conjunction with certain portions of a statement by the defendant in evidence, although such finding and conviction would not have been warranted if the jury either had believed or had disbelieved the whole of the defendant's statement and although there was no evidence of any motive of the defendant for the killing or of any quarrel between him and the woman.

INDICTMENT for murder, found and returned on October 15, 1942.

The case was tried before *Buttrick*, J. Following a verdict of guilty of murder in the second degree, the defendant filed an appeal with an assignment of error.

*F. L. Simpson*, (*H. Mandelstam* with him,) for the defendant.

*W. J. Foley*, District Attorney, & *E. M. Sullivan*, Assistant District Attorney, for the Commonwealth, submitted a brief.

RONAN, J.  The assignment of error in this case is based upon the refusal of the judge to direct a verdict of not guilty at the trial of an indictment charging the defendant with the murder of Sophie Robart, which resulted in the conviction of the defendant of murder in the second degree.

It is undisputed that Mrs. Robart was murdered at about 9:30 o'clock on the evening of August 30, 1942, while she sat in the front seat of the defendant's automobile while it was parked in a road in Franklin Park, in Boston.  The sole issue at the trial was whether she was killed by the defendant.

The defendant's version of the homicide was fully set forth in four statements he gave to the police.  We recite the salient facts contained in these statements.  The defendant, a single man thirty-seven years of age, had for four years been keeping company with Mrs. Robart, who had obtained a divorce from her husband seven years before and was living with her child at the home of her parents in Boston.  The defendant went to her home on the evening in question, and left there with her about eight o'clock for the purpose of attending a moving picture theatre, to which they went in his automobile.  As there was only standing room at this theatre, he drove with her to two other theatres, each of which was exhibiting a picture that either she or he had previously seen.  They did not attend either theatre.  He then drove to the American Legion Highway and stopped near Angell Street, where they spent nearly one half an hour conversing and smoking cigarettes, when a man whom he described appeared by the front right window of the automobile and inquired the way to Boston.  The defendant pointed the direction.  The man then exhibited a revolver.  He warned the defendant and his companion not to make a false move or he would blow out their brains.  He put his hand through the lowered ·front window, opened the rear right door and sat in the middle of the rear seat.  He ordered the defendant to turn to one side the mirror which showed what was to the rear of the automobile.  Still holding the revolver, he demanded the defendant's wallet.  The defendant reached into his coat or

trousers and handed over the wallet.  It contained $30.  He had nearly $23 in another pocket.  The robber then directed the defendant to drive to Morton Street and through the Carter entrance to Franklin Park and along Circuit Drive, where he ordered the defendant to stop and shut off his motor.  The defendant obeyed these instructions.  He had then driven about eight hundred feet into the park.  He stopped near a large boulder which was about two hundred feet north of an electric light on a pole numbered 1706.  The robber struck the defendant under and behind his right ear with some hard object which caused a deep cut one and one half inches in length.  He was rendered unconscious, or dazed or stunned.  He was awakened by the screams of his companion and had a recollection of blows being showered upon her.  He fell or stumbled out of the front left hand door, and Mrs. Robart came through that door either alone or assisted by him.  The robber had disappeared.  The defendant held his companion by the left arm as they ran or walked in a southerly direction toward Morton Street.  They went fifteen, thirty or sixty feet, or maybe sixty yards, when she collapsed in the road.  He ran back to his automobile, turned it around and stopped opposite where she lay in the road.  He endeavored, but was unable, to put her into the rear right door of his automobile.  He then dragged the body to the westerly side of the road, leaving the head and shoulders resting upon the greensward.  He drove out to the entrance of the park, where he stopped, and secured the aid of people who happened to be passing by in automobiles.  He told them that he had been held up and that his woman companion was in the park.  Some of these hastened into the park.  One of them drove him in the defendant's automobile to a hospital where his wound was dressed.  He was then taken to the police station.

An examination of the locus showed that the defendant stopped his automobile near a large boulder.  A blood spot was found in the middle of the road about opposite where the automobile had stopped.  The place where he claimed to have placed the body was on the westerly side of the road about two hundred feet south of the boulder and about

twenty-five feet northwesterly of pole numbered 1706. Two blood spots, each about a foot in diameter, were found in the road, one about fifteen feet to the north of where the body had been, and a second ten feet farther to the north. The victim's pocket book was found in the road near the spot opposite the boulder, and nearby were her broken eyeglasses. She wore a necklace to which was attached a five dollar gold piece. He wore a wrist watch. Neither was taken by the robber. The defendant's ring was found a foot from her body.

An autopsy revealed that she had been cut in the upper right arm. She had been stabbed twice in the armpit and seven times in the back. This was accomplished by a sharp knife three to five inches in length, which was wielded with great force. Some of these wounds penetrated the lung and dissected some of the ribs. She died of exsanguination. According to the medical examiner, these blows were delivered by a person who was standing by the open right front door of the automobile and not by a person located in the rear of the automobile, and the condition of the coagulated blood on her face indicated to him that she slumped face down into a large quantity of blood which was deposited upon the vacant seat back of the steering wheel. He was of the opinion that the victim was unable to move after the attack and that she died within a few minutes. A physician who treated the defendant early on the morning of August 31, 1942, was of the opinion that the defendant was not rendered unconscious by the blow which he had received.

The defendant's automobile had a large blood spot in the driver's seat, some blood on the floor in front of the right front seat, and some blood by the rear running board and the threshold of the rear right door. Blood was found on the handles to both doors on the right side. There was no blood on the top of the back of the front seat.

The knife was never found. The defendant had a small pen knife which he used for cutting twine at the place where he was employed. There was no evidence that he ever had a knife of the kind used in the commission of this offence.

There was no evidence that the defendant had any quarrel with Mrs. Robart or that his relations with her were not respectable and honorable. No motive for the killing was shown, and the jury were so instructed.

The defendant on October 19, 1942, four days after a copy of the indictment was read to him at the jail, attempted to commit suicide by slashing his wrists and forearms with a pencil clip.

The evidence requires careful scrutiny to determine whether it was sufficient to support the verdict. The statements of the defendant, which he made to the police, showed hardly any differences whatever in describing any of the events which he claimed occurred before or after the killing or at the time of its occurrence. If the jury adopted the substance of these statements, they would be bound to come to the conclusion that the murder was committed by a robber. On the other hand, if all these statements were entirely discredited by the jury and if they were wholly eliminated from the case, there would be little left to support this conviction. The jury, however, were not required to accept or reject these statements in their entirety, but they could give credence to such portions as they found trustworthy. It is clear that they did not believe that any robber murdered this woman. There was no evidence, other than what is contained in these statements, that any living person other than the defendant ever claimed to have seen this robber. The defendant never stated that the robber was armed with any knife. All that he claimed to have seen in the way of weapons was a revolver. There was no evidence that any shots were fired. Mrs. Robart, according to the defendant's story to the police, obeyed whatever commands he heard the robber make. There is no evidence that the robber ever made any demand for her money. Her pocket book when picked up in the road did not appear to have been disturbed. One dollar and forty-nine cents was all the money it contained. A five dollar gold piece, which she wore as an ornament and was plainly visible, was not taken from her. The defendant urges that a robber would not seize or demand a necklace which con-

tained this coin, and urges that the same is true of the defendant's wrist watch, as these articles, if stolen, would lead to the identity of the robber. The robber, however, according to the defendant, demanded his wallet or bill fold. He did not in terms demand money. He was willing to and did take the defendant's bill fold which included the defendant's license to operate his automobile, the registration of his automobile and his social security certificate. The defendant retained nearly $23 which he did not hand over to the robber. He claimed he was rendered unconscious by a blow from the robber and that he did not see any assault committed upon Mrs. Robart. He was contradicted in this respect by the medical testimony. Moreover, there was testimony of persons who saw him shortly after he was struck who described his mental condition as calm and normal. There was no evidence that either he or Mrs. Robart did anything that provoked any assault upon either of them by the robber. Neither was there anything to indicate why either should be assaulted by the robber. The last the defendant claimed to know of the whereabouts of the robber was that he was then inside the rear of the automobile. According to the defendant's story to the police, Mrs. Robart was seated in the front seat when she was attacked. That attack, according to the medical examiner, did not come from the rear but came from the direction of the front right door. It began with the cut upon the right arm followed by two stabs in the armpit, as if she had raised her right arm to ward off the blows. These were the only two stabs that were not made through her coat. She then, according to the medical examiner, slumped to her left, face down in the driver's seat, and received the other seven stabs in the back. The locations of the various wounds were shown by photographs. The sequence in which the wounds occurred, their depth and direction were testified to by the medical examiner, a man of great experience who had served for more than thirty years as medical examiner, during which time he had performed more than ten thousand autopsies. The defendant claimed to have been seated in the driver's seat when his

companion was assaulted. The jury, however, saw the automobile with a large blood stain on this seat. According to the medical examiner, that seat was vacant when she was assaulted. The medical examiner saw the victim within approximately an hour after she was murdered, and he saw the pattern and formation of the freshly coagulated blood upon her face. It was formed, according to his testimony, while she lay face down in the blood in the driver's seat. If the jury found certain facts from their examination of the victim's clothes, the defendant's automobile, the number, location and direction of the wounds and then adopted the opinion of the medical examiner, it is plain that they could have discredited the defendant's story as to the presence of any robber and could find that no one other than the defendant was present when this crime was perpetrated. The defendant contends that he and Mrs. Robart were on the way out of the park when she collapsed in the road and died, and that the blood spots in the road and on the rear right door of the automobile corroborate his story. The medical examiner testified that she was incapable of any locomotion after she was stabbed, and that, while death would occur in a matter of minutes, it would be accelerated by any activity. The jury could resolve this conflict in the evidence. They might find it hard to believe why the defendant did not prevent this woman who was mortally wounded from leaving the automobile, if she possibly attempted to leave, and why he did not immediately convey her to a hospital which was only four or five minutes' drive away. The presence of the blood spots in the road indicated that she travelled over the road or that her body was carried along the path indicated by the spots. She weighed only about one hundred thirty pounds. The jury saw the defendant and they could judge of his strength and physique. If they came to the conclusion that she travelled this distance, despite the testimony of the medical examiner, they could find that she was attempting to leave the park by the way she entered and hoped to secure aid when she reached Morton Street. It could be found that she was not seeking the protection of the defendant but was bent on escaping

from her assailant. If the jury found that he intended to put her body in the automobile for the purpose of conveying it to the hospital, they could draw such inferences as they deemed warranted and appropriate when viewed in conjunction with the various other facts surrounding the event.

Belief by the jury that no robber had committed the offence would lead to the conclusion that the wound upon the back of the defendant's head was not inflicted, as he claimed, by the robber, but was self-inflicted in order to divert suspicion from himself. *Commonwealth* v. *Baldi,* 250 Mass. 528, 534.

Four days after a copy of the indictment was read to him at the jail the defendant attempted to commit suicide. The details of this incident were fully set forth in the testimony. The jury were adequately and correctly instructed as to the use that they could make of this testimony, and they were properly left to decide whether they should consider the suicidal attempt as indicating a consciousness of guilt or as due to some other cause consistent with the defendant's innocence. An attempt to commit suicide, like an attempt to escape from jail or a flight after the commission of a crime, may indicate the efforts of a guilty person to avoid punishment for his crime. *Commonwealth* v. *Brigham,* 147 Mass. 414, 415. *Commonwealth* v. *Madeiros,* 255 Mass. 304, 314. *Commonwealth* v. *Mercier,* 257 Mass. 353, 368, 369. *Commonwealth* v. *Millen,* 289 Mass. 441, 480–481. *Commonwealth* v. *Green,* 302 Mass. 547, 552. *People* v. *Barrett,* 22 Cal. App. 780. *State* v. *Hargraves,* 62 Idaho, 8. *People* v. *Duncan,* 261 Ill. 339. *State* v. *Bittner,* 209 Iowa, 109. *State* v. *Painter,* 329 Mo. 314. *State* v. *Jaggers,* 42 Vroom, 281. *State* v. *Exum,* 213 N. C. 16. *Commonwealth* v. *Giacobbe,* 341 Penn. St. 187.

We do not know the motive that actuated the murderer. Motive, however, was not an essential element of the crime, and a conviction might be had in the absence of any proof of motive, although evidence showing a motive is always competent and usually important. *Commonwealth* v. *Bartolini,* 299 Mass. 503, 515. *Commonwealth* v. *Simpson,* 300 Mass. 45, 56. *Commonwealth* v. *Dawn,* 302 Mass. 255, 263.

We have assumed in favor of the defendant that this is a capital case within the meaning of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, although the defendant has been convicted of a lesser crime than one punishable by death and even if the statute would not be applicable if the indictment charged no more than murder in the second degree, which was the offence for which the defendant was convicted. *Green* v. *Commonwealth,* 12 Allen, 155. *Commonwealth* v. *Ibrahim,* 184 Mass. 255. *Commonwealth* v. *Capalbo,* 308 Mass. 376. We have accordingly given considerable attention to all the evidence in order to satisfy ourselves that the ends of justice do not require a new trial. *Commonwealth* v. *Brooks,* 308 Mass. 367.

There was no error of law in the refusal of the jury to believe that Mrs. Robart was slain by a robber. Neither are we able to say that the verdict of the jury was against the law or the weight of the evidence. Every point argued by the defendant has been considered. Whether this murder was committed by a robber or by the defendant was properly submitted to the jury, and the refusal to direct the jury to return a verdict for the defendant was free from error. *Commonwealth* v. *Tucker,* 189 Mass. 457, 460, 461, 486. *Commonwealth* v. *Russ,* 232 Mass. 58, 68, 69. *Commonwealth* v. *Baldi,* 250 Mass. 528, 534. *Commonwealth* v. *Caruso,* 251 Mass. 362, 366. *Commonwealth* v. *Gentile,* 255 Mass. 116, 118. *Commonwealth* v. *Desatnick,* 262 Mass. 408, 413. *Commonwealth* v. *Knowlton,* 265 Mass. 382. *Commonwealth* v. *Albert,* 310 Mass. 811, 819.

*Judgment affirmed.*