COMMONWEALTH *vs.* STANLEY KAVALAUSKAS.

Plymouth.   November 6, 1944. — January 2, 1945.

Present: FIELD, C.J., LUMMUS, DOLAN, RONAN, & WILKINS, JJ.

*Homicide.   Motive.*

A verdict of guilty of second degree murder of a woman was warranted, although there was no direct evidence of the defendant's commission of the crime, by evidence of the position and condition of the body of the deceased when found, respecting clothing on and near the body, of its surroundings, of conduct of the defendant and the deceased when seen together near the scene of the crime some hours before the crime, of conduct and statements by the defendant thereafter, and of blood stains on his clothing.

Motive, although of great evidential value, is not an element necessary to establish the crime of murder.

A verdict of guilty of murder in the second degree properly may be based on inferences which were reasonable although they were not the only inferences that could be drawn.

INDICTMENT, found and returned on February 10, 1944.

The case was tried before *Williams,* J.

*E. G. Townes,* (*E. H. Stevens* with him,) for the defendant.

*J. R. Wheatley,* Assistant District Attorney, for the Commonwealth.

WILKINS, J.   The defendant was convicted of the murder in the second degree of Carrie Higgins.   The case is here on two appeals with an assignment of errors.   G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341.

The first error assigned relates to the denial of the defendant's motion for a directed verdict of not guilty.   There was evidence tending to show the following: On December 2, 1943, at 7:45 A.M. the body of the deceased was found on a wooden ramp or incline leading to an unloading platform in rear of the Hotel Norris on Centre Street, Brockton. The body was that of an "elderly, obese, gray-haired female" slightly less than five feet tall and weighing about one hundred sixty-five pounds.   She was fifty-eight years old.   The clothing on the body was an overcoat, sweater,

dress, slip, corset, underwear, and two pairs of stockings. There was a shoe only on the left foot. The deceased lay on her back with arms spread out to the sides, the legs apart, and the dress tucked in above the knees. The sole of the outer stocking on the right foot was much dirtier than the left and appeared to have been walked on without a shoe. The back of the overcoat, dress, slip, corset, and underwear from the waist down was diffusely stained with blood and excretions. The crotch and inside of the legs of the underwear were stained, and there was a ragged hole in the crotch. In the sweater pocket were two handkerchiefs with recent blood stains, and there was blood on the collar of the dress. Ground into the blood stain on the inner surface of the slip and on the outer surface of the underwear was a large amount of fine and coarse dirt. There was dirt ground into the skin of the buttocks and backs of the thighs. There was soiling by gravel and dirt of the knees and of the inner sides of the legs of both stockings. Both hands were covered with dirt on the palm and the back. An autopsy revealed numerous bodily injuries: a fracture and dislocation of the first two vertebrae of the lumbar spine with a hemorrhage in the vicinity of the fracture; a frontal occipital contusion of the scalp; a hemorrhage on both sides of the skull under the dura, a tough membranous covering of the brain; a deep, ragged laceration parallel with the vulva two inches long and two to two and one half inches in depth passing to the right of the vagina and going upwards to the vicinity of the pelvic bone; a bilateral contusion below the chin above the larynx, or so called Adam's apple, in the fold of the neck in the region of the hyoid bone, which is a U-shaped bone with a body and one large and one small horn on each side; a fracture of the left greater horn of the hyoid bone; a fracture of the lower part of the left tibia; multiple contusions of the arms and legs; slight bruising of the inner surface of both lips; small lacerations of the inner surface of the lower lip; and a bruise on the left side of the tongue two inches from the tip. There had been bleeding from the nose and the mouth. The

cause of death was the fracture of the spine, the injury to the brain, and the compression of the neck, either singly or in combination. The time of death was probably between midnight and 4 A.M. A common cause of a tibia broken as in the case of the deceased is by turning the ankle and putting weight on it. Another cause could have been a blow. The crotch wound was probably caused by being struck with great force by a blunt or a jagged instrument. The fracture of the spine was a crushing one as if force had been applied to each side from the top and bottom, and in consequence there was a laceration of the ligaments holding the spine together, and the spine could be moved from side to side. To achieve this result there had to be either force applied to both top and bottom simultaneously, or force applied to one end while the other end was held stationary. If force were applied in such a way that the shoulders were brought toward the hips and the spine bent, the backs of the vertebrae could separate and the fronts could push against each other. Ordinarily the ligaments that hold the backs of these bones together are so strong that before they give way and tear, the front crushes, as happened in the case of the deceased. The various injuries were caused by repeated blows or impacts. The fracture of the hyoid bone was consistent only with the application of a squeezing force, a force applied at both sides at the same time. It could not have been caused by a fall or running into a wire. With the fracture of the spine the deceased could not have walked, but with the broken tibia she could have walked with considerable pain.

About twenty-eight feet away from the body of the deceased on the side of a one-story ell, a shed on the roof of which was being torn down, there was an iron ladder for use as a fire escape. This led to a flat roof from which access could be had to the main hotel building. To the right of this ladder and about six inches out there was a pool of blood two feet in diameter, the nearest part of which was about one foot and a half from the ladder. There were five blood spots between this pool and the ramp. There were a shoe and women's clothing on the

ground near the ladder on the other side from the pool of blood.   There was a paper shopping bag containing women's clothing on the unloading platform, and similar clothing was scattered about the ramp, platform, and adjacent ground.   There were bits of plaster on the ground near the ramp and the body of the deceased.

About 10:30 P.M. on Wednesday, December 1, 1943, one Melcherson, the manager of the Hotel Norris, was at his desk in the lobby on the second floor.   He heard voices from the stairway leading up from the front entrance, and upon investigation observed through glass doors part way up the stairs a woman seated on the second step from the bottom talking with the defendant.   The defendant at times had hired rooms at the hotel, and on November 29 had taken room 72 for a week, paying $3.50 in advance.   Melcherson did not know the woman, but after her death he identified her as the deceased.   He observed that the defendant was holding one of the glass doors part way open.   The defendant had one or more paper bags in his hands.   Melcherson returned to his desk.   He then heard the deceased say, "What will I do?   What will I say?" to which the defendant replied, "Walk right up and if anybody stops you, tell them you are going to room 72."   Melcherson at once left his desk and walked down the stairs.   The deceased had taken a few steps inside the glass doors.   Melcherson said, "Lady, where are you going?"   The deceased answered, "I am going to room 72."   Melcherson replied, "You can't go to room 72.   We don't allow any ladies in the men's rooms."   The deceased responded, "All right," and went out onto the sidewalk while Melcherson held open the doors.   By this time the defendant had walked out and was not in sight.   The deceased was drunk and unsteady on her feet.   Her face was flushed and smudged with dirt.   There was a colorless, wet spot on the step where she had been sitting, and she left wet spots where she walked on the stairs.

The deceased was seen alone on December 2 about 12:15 A.M. leaning against the hotel building on Centre Street.   She had a paper shopping bag and was under the influence of liquor.   She was not again observed alive by any witness.

Sometime after midnight the defendant was stopped by the night clerk in the Hotel Norris on the way to his room. Acting under instructions from the manager the night clerk refunded $2 of the rent and asked the defendant to leave the hotel, which he did.

About 2 A.M. and again shortly thereafter a witness saw the defendant walking alone on streets in the business section of Brockton, one of which was School Street. About 2:10 A.M. he registered at the Corinne Hotel, which was in the vicinity, and went to his room. While he was talking with the hotel clerk, a police officer whom he had known well as a boy was standing close by, but the defendant did not speak to him.

On December 2 at 1 P.M. the defendant in a café in the business district of Brockton had a conversation with an acquaintance, who said, "I see there was a woman killed down back of the Hotel Norris last night," to which the defendant responded, "Was she an elderly woman or a young woman?"

Later that afternoon the defendant was questioned by the police at the Brockton police station. The defendant stated that on the afternoon of December 1 he had been at several cafés in Brockton at one of which he met for the first time the deceased, who suggested that she would have sexual intercourse with him for $2. He gave her no money, but as a result they went to the Hotel Norris in an unsuccessful effort to go to his room. According to the defendant the deceased then said, "I told you you couldn't get me up there," the defendant replied, "I done my best," and the two parted. The defendant told the police that thereafter he went to a café and then returned to the Hotel Norris but was not allowed to remain. He said that he next went to the Waldorf Lunch, where he was employed, and had a cup of coffee downstairs with the employees, one of whom was named Buckley. He then registered at the Corinne Hotel. He denied that he had been on School Street that night. The police called the defendant's attention to marks on the coat he was wearing, on the lower part of the left front, the left lapel

up around the neck, on "the right lower part of the lapel," and elsewhere on the left side of front. The defendant said that he got them between 6 P.M. and 7 P.M. the night before in a fight on the sidewalk outside the front door of the Naples Café; that he met a man he had never seen before who told the defendant that he saw that the defendant's wife was back in town and was pregnant again; that the defendant "smacked him in the nose," and walked away; that only one blow was struck, but that the other man bled quite a little. There was also blood on the defendant's sweater and shirt and on the trousers all the way down the left leg in front, and there were spots above and below the right knee as well. There were fresh scratches on both the defendant's hands which he said he had received washing glasses at the Waldorf Lunch. At one time the defendant said that he had received them two weeks before and at another time that he received them the previous day. The defendant also accompanied the police to point out the place on the sidewalk in front of the Naples Café where he had said he had the altercation. Later chemical examination failed to reveal any blood stains on the sidewalk. The jury could have believed Buckley who testified that he was the only person of that name employed at the Waldorf Lunch, and that he did not see the defendant on the night of December 1.

The defendant's clothing was turned over to a chemist who, in addition to the blood stains observed by the police about which they questioned the defendant, discovered on the inside of the trousers blood stains on the lining at the right of the fly, in the crotch, and in several other places over that area. It was his opinion that the blood came there as a result of the trousers coming in contact with a bloody surface. The blood was distributed across the surface in streaks with sharply defined borders, indicating that the trousers were folded at the time. The blood spots on the fly came from the inside outwards, because they were larger on the inside surface of the cloth than on the outside. This was human blood on the coat, trousers, sweater, and shirt of the defendant. The de-

fendant's shoes had a residue of plaster on the bottoms similar to the plaster on the ground in back of the Hotel Norris between the foot of the ladder and the unloading platform.    There was a similar residue of plaster on the shoe of the deceased.

The defendant's motion for a directed verdict was rightly denied.    We see no occasion unduly to extend the sordid details of this crime for permanent preservation in our reports.    The jury could have found that the defendant and the deceased, while under the influence of liquor, attempted to enter the Hotel Norris for the purpose of sexual relations; that somewhat later the defendant returned to the hotel and immediately left following the termination of his occupancy after midnight and about the time the deceased was last seen leaning against the front of the hotel building; that the defendant's explanation given to the police as to the cuts on his hands, as to the blood on his clothing, and as to his movements after Melcherson had turned the deceased away from the hotel at 10:30 P.M. was false; that the defendant's clothing had touched the bloody wound on the deceased's crotch when the front of the trousers was folded apart; that the lime on his shoes indicated he had been in the rear of the hotel; that he had been there between midnight and 2 A.M. in part of the period when and at the place where the deceased had met violent death at human hands; and that those hands were the hands of the defendant.    The defendant contends that the evidence is at least as consistent with death having been occasioned by a fall from the ladder.    This is not sound.    It could have been found that the injuries were not received in one series of accidental impacts; that the throat injury could not have been occasioned by any fall; that the deceased had walked on the ground after her shoe came off; that she so walked from the pool of blood near the base of the ladder toward the ramp; and that the pool of blood had come from the wound in her crotch.    It further could have been found that she could not walk after sustaining the spine injury, even though she might have walked with pain after her ankle was broken, and that the spine injury was received

either at the spot where her body was found or at some point nearby from which, as indicated by the dirt in her skin, she was dragged to the ramp, where her skirt at some time was tucked in between her legs.

The defendant places reliance upon the fact that the medical evidence failed to disclose that any one had had sexual intercourse with the deceased. This evidence, however, did not disclose that sexual intercourse had not taken place. Nor does the fact that a $5 bill was found on the deceased avail the defendant. At most this evidence bears upon motive. And motive though of great evidential value is not an essential element of the crime of murder and need not be proved. *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33, and cases cited. It is enough that the jury's inferences were reasonable, even though they were not the only inferences which could be drawn. *Commonwealth* v. *Merrick*, 255 Mass. 510, 514. *Commonwealth* v. *Desatnick*, 262 Mass. 408, 413. *Commonwealth* v. *Williams*, 312 Mass. 553, 557. See *Sheehan* v. *Goriansky, ante,* 10, 17.

The second error assigned relates to the denial of his motion for a new trial, which was based on the reasons that the verdict was against the evidence and the weight of the evidence, and that justice had not been done by the verdict. The motion was addressed to the discretion of the judge, of which there was no abuse. *Commonwealth* v. *Gricus, ante,* 403, 405. There was no error of law in the denial of the motion. If it be assumed in the defendant's favor that this is a capital case within the meaning of G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341 (see *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 34; *Commonwealth* v. *Venuti*, 315 Mass. 255, 262), we are satisfied from a thorough consideration of all the evidence that the verdict was a just one.

*Judgment affirmed.*