COMMONWEALTH *vs.* FRANCIS H. MOORE.

Middlesex.   May 3, 1948. — June 9, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, SPALDING, & WILLIAMS, JJ.

*Evidence*, Relevancy and materiality; Test; Hypothetical question; Opinion: expert. *Motive. Homicide. Practice, Criminal*, Requests, rulings and instructions.

At the trial of an indictment for murder of the caretaker of a diner in his cabin near the diner in the nighttime, where there was evidence that the diner had been broken into on the same night, no error appeared in the exclusion of evidence offered by the defendant that it also had been broken into a few days before, where the earlier break was not shown to have had any connection with the murder.

At the trial of an indictment for murder, where the evidence was that the murder was accompanied by a great flow of blood, and that blood would remain in the skin of a person's hands for five days, a chemist rightly was permitted to testify as an expert that with the aid of a

benzidine reagent he found blood on the defendant's hands three days after the murder.

No error appeared in permitting an expert witness to answer a hypothetical question posited upon assumption of facts relating to conduct of the defendant which were in issue in the case, where the answer involved no expression of opinion as to the truth of the assumed facts.

After the introduction, at the trial of an indictment for murder, of testimony of a chief of police, who previously had seen the defendant and whom the defendant had seen, that, speaking in a pool room when within three or four feet of the defendant, he had asked the proprietor if he knew a boy bearing a name by which the defendant was known, and that within half an hour the defendant had telephoned the chief asking if he was wanted and later had come to the police station, it was proper to permit the chief to testify that in his opinion the defendant could have heard his talk with the proprietor in the pool room.

Mere lack of evidence of motive does not require the ordering of a verdict of not guilty at the trial of an indictment for murder.

At the trial of an indictment for murder in the nighttime of a sixty-six year old caretaker of a diner, where the victim was found in a cabin near the diner, battered and in bloody surroundings, a verdict of murder in the second degree was warranted by evidence that the defendant, returning in haste to an automobile near the diner on the night of the murder, had said to a companion who had been waiting for him, "Let's get the hell out of here. . . . I just socked a guy. . . . An old man"; that three days later there still was blood on the defendant's hands; and that, when he heard the chief of police asking for him in a pool room a few days after the murder, he had failed then to disclose his identity.

An exception, saved at the close of the judge's charge at the trial of an indictment for murder to a refusal of a request, then made for the first time, that an instruction be given concerning manslaughter, properly raised the question of the propriety of such refusal.

No error appeared in a refusal, at the trial of an indictment for murder, to instruct the jury concerning manslaughter where there was no evidence that would have warranted a verdict of manslaughter.

INDICTMENT, found and returned on January 24, 1947.

The case was tried before *Kirk, J.*

*B. F. Chesky*, for the defendant.

*M. E. Viola*, Assistant District Attorney, for the Commonwealth.

LUMMUS, J.   One William A. McCormack, a man of sixty-six years, was employed as a cleaner and caretaker at Ken's Diner, an eating and drinking place in Framingham on the northerly side of the Worcester Turnpike.   About one o'clock in the morning of Saturday, January 18, 1947, he finished his work and went into his cabin located about eighty-five

feet in the rear of the diner, where he lived alone. He shut the outside door of the cabin. About seven o'clock on the same morning the door of his cabin was found open. His dead body, clad only in his underclothes, was found lying on a couch or bed. His face had been repeatedly beaten. There was much blood on his face and on the sheets. Blood had dripped from his face to the floor, and many small blood spots were on the wall on the farther side of the bed from the door. His trousers were resting on some bottles near by, and were covered with human blood which had penetrated through them, although there was none on the underclothes that were on the body. Expert testimony was to the effect that the blood on the trousers and also on a dish cloth or towel found in the cabin was the result of the wiping of his hands on them by the assailant. Someone had broken into the diner during the night, a "juke box" and a cigarette machine had been broken, and six bottles of liquor were missing. Police were called, and searched for fingerprints, but found none.

The defendant, Francis H. Moore, a youth of nineteen years, was indicted for the murder of McCormack. At the trial he was found guilty of murder in the second degree and was sentenced to imprisonment for life. His appeal to this court brings up nine assignments of error.

To a considerable extent the movements of the defendant on the morning of the killing are not in dispute. With several male companions, including Edward McKeeby and Raymond W. Craig, he went to his own house about two o'clock in the morning, and played cards. Having no sugar, and wishing to get some sugar for coffee from McKeeby's house, the defendant and McKeeby borrowed Craig's automobile, and started out in it. They did not go to McKeeby's house, but chased another automobile — for what purpose did not appear unless it was for a race — until they lost it. From this point the testimony of McKeeby differs from that of the defendant. McKeeby testified that they stopped the automobile near Ken's Diner, where the defendant got out alone and was gone some time, during which McKeeby went to sleep in the automobile. When the defendant returned,

he was out of breath. Getting into the automobile, he said, "Let's get the hell out of here." McKeeby asked him what the hurry was. The defendant answered, "I just socked a guy." McKeeby inquired, "Who?" The defendant replied, "An old man." The defendant started the automobile, and at South Framingham he took in two unknown drunken men and drove them home. The defendant stopped a police automobile to ask for gasoline for the automobile, for the gasoline was low, but he got none. Then one Giombetti gave them some gasoline, and they returned to the defendant's house, arriving there about half past four o'clock in the morning. The defendant, on the other hand, testified that he made no stop near Ken's Diner, did not visit Ken's Diner, did not strike or even see McCormack, and did not have the conversation with McKeeby to which the latter testified.

The first assignment of error is waived. The second assignment is to the exclusion of questions asked by the defendant on cross-examination of the manager of Ken's Diner, as to whether the diner was broken into about January 15, 1947, a few days before the killing of McCormack. Such a break was not shown to have any connection with the killing. If there was such a break there was nothing to show that the one who broke in was the assailant of McCormack several days later. *Commonwealth* v. *Abbott*, 130 Mass. 472. The argument would be much stronger that the person who broke into the diner on the very morning when McCormack was killed was guilty of the killing. Counsel for the defendant recognized this when he said to the jury in his argument, "You find the man who went into Ken's Diner and stole the six quarts of liquor and you have got this mystery solved." The circumstances of the breaking and entering and larceny on the night when McCormack was killed were fully disclosed by the evidence, apart from any doubt as to the identity of the offender. No error appears in the exclusion of evidence of the earlier break.

The third assignment of error is to the admission of the testimony of a chemist, Dr. Joseph T. Walker, employed by the department of public safety, as to the result of a

chemical test of the defendant's hands on January 21, 1947. The chemist was allowed to testify that with the aid of a benzidine reagent he found blood on those hands. The re-agent produces a blue color where blood is present on or in the skin. Blood on the skin gets down into pores and crev-ices, and is not washed off by soap and water. Blood may remain on the skin of the hands for at least five days. The defendant had the habit of biting his nails, but the blood reaction appeared on other parts of his hands, remote from the nails. It is true that milk and certain plant tissues also will produce a blue reaction when a benzidine reagent is applied. But there was no evidence that the defendant had any such substance on his hands. In the case of plant tissues, when they are handled a test of the hands will show only a weak blue reaction. The objection to this evidence made by counsel for the defendant was, first, that an examination on January 21, 1947, would not show traces of blood that got on his hands on January 18, 1947. As to this, the evidence was that the blood would remain on the hands as long as five days. The second ground of objection was that the test would not show whether the blood came from McCormack or not. But the test would be competent although it did not show whose the blood was. Other evidence might lead to the conclusion that the blood was McCormack's. *Greenfield* v. *People*, 85 N. Y. 75.

The fourth, fifth and sixth assignments of error relate to the admission of a hypothetical question to the same chemist. He testified that at least part of the blood on the trousers came there by a wiping or smearing process. Over the exception of the defendant the Commonwealth was permitted to ask the following question: "Assuming . . . that the defendant had struck a man between the hours of two and five o'clock on the morning of January eighteenth, and assume that the man struck bled in the manner that you noticed and saw on the man's face . . . [in a photograph], assume, if you will, that the man [who struck the deceased] wiped his hands off, that some blood had got upon his hands and they were wiped off on a pair of trousers, as you have in here as an exhibit, and assume further that his hands were

wiped with a dish cloth such as you have seen here and is now an exhibit, and assume that individual from that day on washed his hands once or twice a day, and assume on the twenty-first, at the hour that you examined him, you found the reaction on his hands as appeared in the exhibit [a photograph] that you have just had presented to you, have you an opinion as to whether or not the blood that was upon his hands at the time that he is presumed to have struck the individual, is the blood that appeared as a result of your test in the nature of a reaction?" The expert then testified that blood could remain on the hands for that period of time under those conditions and give a test comparable to the one he found.

The defendant contends that the question improperly assumed that "the defendant" had struck a man and had got blood upon his hands, and had wiped his hands on the trousers and dish cloth. The answer of the question involved no expression of opinion by the witness as to the truth of the facts stated in the hypothesis. If the jury did not find that the defendant struck McCormack, the question and answer went for naught. In *Commonwealth* v. *Russ*, 232 Mass. 58, 73, 74, Rugg, C. J., said, "It is essential . . . that in giving testimony the expert witness should not undertake to pass upon the truth of the fundamental hypothesis upon which his opinion rests unless the facts assumed are within his own observation and knowledge. He simply must assume those facts as the basis of his opinion. It is the province of the jury alone to decide whether those facts are established. If they are established in substance to the satisfaction of the jury, then and not until then can the value of the expert evidence be taken up by them. If such facts are not so established, then the jury do not reach at all the consideration of the expert testimony." See also *Commonwealth* v. *Tucker*, 189 Mass. 457, 476, 477; *Commonwealth* v. *Noxon*, 319 Mass. 495, 538. We do not suggest that the hypothetical question just considered was in the best form. But we find no error in any respect covered by these assignments of error.

The seventh assignment of error relates to testimony

given by one McCarthy, the chief of police of Framingham. He testified that he had been a member of the police force for many years, and that a large part of his police duty had consisted of directing traffic. He testified that, while he was directing traffic, he had seen the defendant driving a cab and that the defendant had seen him. It could have been found that the defendant knew him. He testified that on January 21, 1947, when in civilian clothes, he went to Silva's pool room in Framingham, and talked with the proprietor, one Silva. Three or four feet from them stood a young man with a pool cue in his hand, who, the chief of police later learned, was the defendant. In "an ordinary low tone, not too loud," the chief of police asked Silva whether he knew a boy named "Midgie Moore," which was the name by which the defendant was called. Silva said he did not know him. During the talk the chief of police raised his voice a little, and the defendant stood there looking at him, but said nothing. Over the exception of the defendant, the chief of police was allowed to testify that in his opinion the defendant could have heard the talk. Within half an hour after this talk, after the chief of police had returned to the police station, he received a telephone call from the defendant, asking whether he was wanted, and about an hour later the defendant came to the police station.

The defendant contends that it was error to permit the chief of police to express the opinion that the defendant could have heard the talk with Silva. Very likely the judge could properly have excluded that opinion. *Commonwealth v. Cooley*, 6 Gray, 350, 352, 354, 355. *Morrissey v. Connecticut Valley Street Railway*, 233 Mass. 554, 557. But there was no error in its admission. The so called opinion was "a method of indicating a somewhat complex set of facts observed by the witness." "Such collective facts, although within the comprehension of men in general, often cannot be described in detail to the jury as they appeared to the witness. Even though the judgment or estimate necessarily involves more or less of opinion or inference as to familiar objects and well known matters, like testimony as to identity, size, time and distance, such a question comes within the

rule of *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 133."
*Ross* v. *John Hancock Mutual Life Ins. Co.* 222 Mass. 560,
562. *Commonwealth* v. *Klosowski*, 252 Mass. 149. See also
*Copithorn* v. *Boston & Maine Railroad*, 309 Mass. 363, 366.
The judge instructed the jury that the failure of the defend-
ant to reply is not to be considered "unless the jury is satis-
fied that the defendant heard what was said and the circum-
stances were such as would call for a reply, either in form of
words or some action, from him."

The eighth assignment of error is that a verdict of not
guilty should have been directed. It is true that the evi-
dence for the Commonwealth might have been stronger.
No fingerprints were found. No blood was found upon the
defendant's clothing. The defendant did not flee. There
was no direct evidence that the defendant ever had the bot-
tles of liquor that were stolen from Ken's Diner on the night
of the killing. No motive for the crime was shown. But
in proving a murder the Commonwealth need not prove a
motive. *Commonwealth* v. *Kavalauskas*, 317 Mass. 453,
460. And in our opinion the evidence already narrated, of
the admission made by the defendant to McKeeby, of the
remains of blood on the defendant's hands, and of his
failure to disclose his identity when the chief of police was
inquiring about him at Silva's pool room, made a case for
the jury, and warranted the verdict of guilty of murder
in the second degree.

The ninth assignment of error is to the refusal of the
judge to charge the jury as to the crime of manslaughter.
There was no request so to charge presented before the
arguments, under Rule 71 of the Superior Court (1932).
But at the conclusion of the charge the defendant asked an
instruction concerning manslaughter, and excepted to the
refusal to give it. That exception properly raised the
question. *Brick* v. *Bosworth*, 162 Mass. 334. *Pelatowski* v.
*Black*, 213 Mass. 428, 431. *Hughes* v. *Whiting*, 276 Mass.
76, 79.

When the body of McCormack was found, no trousers
or shoes were on the body. He was in his underclothes. His
trousers were resting on some bottles near the head of the

bed on which he was lying. An expert, Dr. Moritz, who examined the body and performed the autopsy on January 18, 1947, testified that the condition of the body indicated that McCormack was lying down when the bleeding began, and that his injuries were caused by violent blows. Obviously McCormack was ill prepared to engage in any fight or struggle, and there was no evidence of any. The defendant testified that he did not visit Ken's Diner or the cabin behind it, did not strike McCormack, and never saw McCormack in his life. In the argument for the defendant no contention was made that McCormack had been in any fight or struggle, or that a verdict of guilty of manslaughter was possible. Every indication in the evidence leads to the conclusion that McCormack did not engage in any fight or struggle, but was lying on his bed when killed. The substantial question was the identity of his slayer. There was no evidence to warrant a verdict of guilty of manslaughter. Under these circumstances it was not error to refuse to charge as to manslaughter. *Commonwealth* v. *Soaris*, 275 Mass. 291, 299. *Commonwealth* v. *Green*, 302 Mass. 547, 556. In *State* v. *Spaugh*, 200 Mo. 571, 605, the court said, "there is another equally conclusive reason why the court should not have instructed on manslaughter; because the defendant did not pretend that he shot and killed the deceased on account of any lawful provocation and in the heat of passion; on the contrary, he testified that he did not shoot the deceased, made no threats against his life and did not know that the sheriff had been shot until sometime after the shooting." See also *Clark* v. *State*, 117 Ga. 254; *Driscoll* v. *State*, 136 Ga. 104; *Hays* v. *State*, (Texas Crim. App.) 57 S. W. 835.

The defendant further invites us to consider the whole case under G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, and to order a new trial because justice so requires. We assume in favor of the defendant, without deciding, that a murder case remains a "capital case" even after a verdict of guilty only in the second degree. *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 34. *Commonwealth* v. *Venuti*, 315 Mass. 255, 262. *Commonwealth* v.

*Kavalauskas,* 317 Mass. 453, 460. Under the statute, we can order a new trial only where the verdict, if allowed to stand, would work a miscarriage of justice. *Commonwealth v. Gricus,* 317 Mass. 403, 407. *Commonwealth* v. *Bellino,* 320 Mass. 635, 646. Upon all the evidence, we cannot say that the verdict was unjust, or that a new trial is required.

*Judgment affirmed.*