Alfred F. **FAGUNDES, Jr.**, Defendant,
Appellant,

v.

**UNITED STATES of America**,
Appellee.

**No. 6296.**

United States Court of Appeals
First Circuit.

Heard Nov. 2, 1964.

Decided Jan. 25, 1965.

Raymond J. Dowd, Boston, Mass., with whom Joseph Sax, Boston, Mass., was on brief, for appellant.

A. David Mazzone, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Senior Circuit Judge (by designation).

On this appeal from a judgment imposing concurrent sentences on the appellant on two counts for bank

robbery in violation of Title 18 U.S.C. § 2113(a) and (d), of which he had been found guilty by a jury, we are concerned once more with questions of search and seizure. One allegedly illegal search was of an automobile in which local police found United States currency later traced by the FBI to the robbed bank. Two other allegedly illegal searches were of the apartment of one Mary Barton at 84 Gordon Street, Brighton, and of the apartment of one Lucille Poulos at 78 Hillside Avenue, Roxbury, where the appellant was found by local police and arrested.

On September 5, 1963, shortly after 1:00 o'clock in the afternoon, two men wearing Halloween masks and brandishing revolvers entered the Washington Square office of the Brookline Trust Company.[1] One of the men announced "This is a hold up" and ordered the assistant branch manager to lie down on the floor. When he was slow in complying the bandit fired a shot in his direction which lodged in a baseboard. The bandits then quickly collected over $13,000 from the tellers on duty and left. Just after the bandits backed out of the door the branch manager, who had hidden during the holdup, went to the window and saw the two men removing their masks and getting into a white 1963 Chevrolet sedan parked at the curb in front of the bank. The branch manager read the license number of the car as it was driven off, wrote the number down on a slip of paper, and notified the police.

About 2 o'clock that afternoon the automobile identified by the branch manager was found abandoned in front of 1376 Commonwealth Avenue, Boston, about a block and a half from 84 Gordon Street, Brighton. An examination of the vehicle and subsequent investigation disclosed that it had been stolen the day before while it was parked on Beacon Street in Brookline. In the car when it was stolen were miscellaneous items belonging to the owner including men's and women's sample shirts, jackets, brief case, ruler, golf clubs, keys and gloves. When the car was recovered and examined none of these articles were in it.

The scene now shifts to Abington, Massachusetts, a small community about 15 miles south and a little east of Boston.

About 8:00 o'clock in the morning of September 6, 1963, the day after the robbery, Officer Mackiewicz of the Abington Police, responding in his cruiser to an automobile accident report, came upon an old convertible rammed against a tree. As he approached he saw a man emerge from behind the wheel and stagger toward the rear of the car. He arrested the man for driving under the influence, driving so as to endanger, and intoxication. He also arrested a woman in the car for intoxication and drove both of them in his cruiser to police headquarters. They proved to be George and Mary Barton, husband and wife, who lived in an apartment at 84 Gordon Street, Brighton.

Officer Mackiewicz with another officer returned to the scene of the accident to remove the convertible. He found that although he could start the engine he could not put the vehicle into reverse and his brother officer sent for a wrecker. Officer Mackiewicz then undertook to secure the contents of the car from the weather, for it was raining hard at the time and the back window was broken out or missing. In doing so he saw a woman's good-sized straw handbag lying open on its side on the back seat of the car with bundles of United States currency in plain sight in it. The convertible was removed by wrecker to the yard of the police station and officer Mackiewicz carried the straw bag with its contents into the police station and turned it over to the acting chief of police.

In the meantime the Bartons had been "booked" by other officers in the course of which George Barton had been asked for his driver's license and had handed his wallet over to an officer. In looking through the wallet for the license the

---

1. It is conceded that the Brookline Trust Company is a federally insured bank.

officer found eleven $100 bills and two $50 bills.

The acting chief of the Abington Police notified a lieutenant of the State Police of his find and of his natural suspicions and the latter notified the FBI. Soon thereafter the lieutenant and agents of the FBI came to Abington Police Headquarters and they, with the acting chief and local officers, took the money to a nearby bank to count it. They found $5,495, including the money discovered in George Barton's wallet, in bills of various denominations. A comparison of the serial numbers of the bills with the serial numbers of bills in "robbers packs" [2] handed by the Brookline Trust Company tellers to the robbers the day before identified 29 of the bills as having been stolen from the bank.

Later in the day Boston and Brookline police officers armed with a search warrant went to the Bartons' apartment at 84 Gordon Street, Brighton. Their search revealed two masks similar to those worn by the bank robbers, Smith & Wesson .38 calibre cartridges, one cartridge shell of the same calibre, a canvas money bag similar to one passed the day before by a teller at the bank to the bandits, and three $5 bills, two of which had serial numbers listed as in the "robbers packs." They also found a pair of gloves which had been in the bandits' getaway car when it was stolen.

Still later in the day, about 6:30 P.M., Boston detectives went looking for Fagundes in one of his known haunts, the apartment of Lucille Poulos on the second floor of 78 Hillside Avenue, Roxbury.[3] They knocked on Mrs. Poulos's door and announced themselves to be police. She admitted them and gave them permission to look for Fagundes, whom they flushed out of a closet at gun point. He was promptly arrested, charged with complicity in the robbery of the Brookline Trust Company and handcuffed. Although Mrs. Poulos gave the officers permission to search her apartment without a warrant, nevertheless some of the officers went for a search warrant while others held Fagundes under guard in the apartment. The officers' search on warrant revealed a package of money containing 34 $5 bills identified by their numbers as from the bank's "robbers packs," a Smith & Wesson .38 calibre revolver, 5 .38 calibre cartridges, and golf clubs, shirts and other items later identified as having been in the getaway car when it was stolen.

An admitted ballistics expert positively identified the bullet taken from the baseboard at the bank as having been fired from the Smith & Wesson revolver found in Mrs. Poulos's apartment and from no other firearm.

Fagundes and one Daniel J. Herd, who with his wife lived in the first floor apartment at 78 Hillside Avenue, Roxbury, were indicted in two counts for armed robbery of the Washington Square office of the Brookline Trust Company in violation of Title 18 U.S.C. § 2113(a) and (d). George and Mary Barton and one Christopher F. Herd were indicted for possession of money stolen from the bank in violation of Title 18 U.S.C. § 2113(c). On the government's motion all cases were consolidated for trial. Pretrial motions by Fagundes and Daniel J. Herd and by the Bartons to suppress the evidence obtained as described hereinabove were denied. All defendants plead guilty except Fagundes who stood trial by jury, was found guilty and sentenced and then took this appeal.

The appellant's basic contention is that the "search" of the Bartons' car by officer Mackiewicz of the Abington po-

2. "Robbers packs" are bills, the serial numbers of which have been recorded, bound together in a package by a paper band stamped with the bank's initials and the teller's initials and identifying number.

3. The record does not disclose the basis for the detectives' belief that Fagundes was concerned in the bank robbery. This need not concern us, however, for the legality of his arrest was not raised in the court below and indeed is only rather vaguely suggested on this appeal.

lice was illegal. Wherefore it is asserted that subsequent searches, although on warrants, of the Barton and Poulos apartments were also illegal for the reason that the warrants were obtained on the basis of information flowing from the illegal discovery of the money in Abington. We do not agree for there was no "search" in the legal sense of the Barton automobile.

█ Officer Mackiewicz did not return to the Barton car for the purpose or with the intention of searching it. Nor when he got there did he rummage in the glove compartment or pry into the trunk. See Davis v. United States, 327 F.2d 301 (C.A. 9, 1964). He went back to the car to remove it from the scene of the accident and, finding that he could not move the car under its own power, he undertook to protect its contents from the weather until a wrecker arrived by closing the windows. In doing so he saw bundles of money in an open straw bag lying in plain sight on the back seat. This was no search for it is well established that it is not a search to see what is patent and obvious either in daylight or even in artificial light. United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), Petteway v. United States, 261 F.2d 53, 54 (C.A. 4, 1958), Davis v. United States, supra, 327 F.2d 305, and cases cited. Police officers are not required to go about their routine duties with their eyes shut.

Nor was it illegal for officer Mackiewicz to turn the bag of money over to his chief when he returned to headquarters. That would be normal procedure to protect the property from thieves. And the chief very properly counted the money in the presence of other officers in order to protect himself and his men from any possible charge of embezzlement. This also would be normal police procedure. Hav-

ing the money properly in possession we see no reason why the police could not scrutinize it. We think it would be normal police procedure, at least under the circumstances, to check the numbers on the bills with the numbers of the bills in "robbers packs" which had been handed to the bank robbers. We find the procedure of the officers in Abington routine, proper and legal, wherefore what flowed from their action was not "fruit" from a "poisonous tree." The evidence discovered in the Bartons' car and in their apartment and in Mrs. Poulos's apartment was admissible.

█ This evidence plus other evidence in the record tying Fagundes to the bank robbery, which we need not state in detail, is clearly enough to warrant the jury's verdict. His motion for judgment of acquittal was very properly denied.

We turn now to other contentions of the appellant.

█ The arresting officer in the course of describing Fagundes's arrest testified that when he flushed Fagundes out of Mrs. Poulos's closet he announced "you are under arrest in connection with the armed robbery of the Brookline Trust Company." The officer then added that he asked Fagundes what he had to say, to which Fagundes replied that he did not want to say anything but wanted to see a lawyer.[4] This testimony related directly to the appellant's arrest and was descriptive of that event. It was not even specifically objected to. Its admission was not error.

Later on in the trial, however, Fagundes elected to take the stand in his own defense to assert his complete innocence and to attempt to establish an alibi by showing that at the time of the bank robbery he was in the Massachusetts Superior Court for Middlesex County in Cambridge in connection with a criminal

4. The record does not show that Fagundes was pressed by further questions of any police officer either in Mrs. Poulos' apartment or elsewhere, or that he ever made any statement to the police or that his request for counsel was denied or frustrated in any way.

charge.[5] To impeach Fagundes's testimony that in fact he had been in the Cambridge courtroom at or so soon after the bank robbery that he could not have traveled from one place to the other the Assistant United States Attorney was allowed, over specific objection, to ask Fagundes why he had not protested his innocence when he was arrested instead of refusing to say anything and asking to see a lawyer, and why, when he was brought before a commissioner, he had not asserted his alibi.

■ Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), teaches that incriminating post indictment statements elicited from an accused in the absence of his counsel deprive the accused of his constitutional right to counsel under the Sixth Amendment and cannot be introduced in evidence against him at his trial. Escobedo v. United States, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), goes further. It teaches that the constitutional right to counsel arises at least when an accused is arrested and perhaps even at an earlier stage when police attention begins to "focus" on the accused whenever that may be.[6] Thus when Fagundes said when he was arrested and handcuffed that he wanted to see a lawyer he was exercising a federal constitutional right. And certainly at that juncture he had the constitutional right to keep silent. Id. at 485, 84 S.Ct. 1758. His assertion of one constitutional right, his right to counsel, and his reliance upon another constitutional right, his right to remain silent when charged with crime, we think cannot be used against him substantively as an admission of guilt, for to do so would be to render the constitutional rights mere empty formalities devoid of practical substance. See dissenting opinion in Jones v. United States, 111 U.S.App.D.C. 276, 296 F.2d 398, 410 cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962).

But the Assistant United States Attorney did not undertake to use Fagundes's silence and request for counsel as an admission of guilt.[7] His purpose in asking the questions was to cast doubt on Fagundes's credibility, that is, to suggest that his assertion of an alibi was an afterthought.

■■ When one takes the stand in his own defense he of course puts his credibility as a witness in issue. Nevertheless we think it reversible error to permit evidence of refusal to talk and of request for counsel on arrest to be used for the purpose of impeachment. In the first place such evidence is ambiguous. Fagundes's words when arrested can as well be taken as indicating reliance upon constitutional rights as supporting an inference that his alibi was an afterthought. There is nothing to indicate which interpretation is more probable. Cf. Grunewald v. United States, 353 U.S. 391, 415-524, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). In the second place we think it reversible error to permit a jury to draw any inference adverse to one accused of crime from his reliance upon his constitutional right to silence and to the advice of counsel. The right to silence on arrest is akin to the right to decline to take the witness stand in one's own defense. Helton v. United States, 221 F.2d 338, 341-342 (C.A. 5, 1955).

The same may be said with respect to Fagundes's failure to assert his alibi when he appeared before a Commission-

5. The government had to concede that Fagundes was indeed in the Massachusetts Superior Court in Cambridge on the day of the bank robbery. But in rebuttal it demonstrated that on the Massachusetts court's records Fagundes might not have been in that court at or soon after 1:00 P.M., and it introduced testimony that in fact he was there a matter of hours after the robbery.

6. In short, we read the Court's opinion in Escobedo as read by Mr. Justice White, who dissented with Mr. Justice Clark and Mr. Justice Stewart. See 378 U.S. page 495 et seq., 84 S.Ct. page 1767.

7. Indeed such substantive use would probably be error for the additional reason that it would not be probative. Kelley v. United States, 99 U.S.App.D.C. 13, 236 F.2d 746 (1956).

er. He was well within his rights in not tipping his hand to the government by disclosing his defense before trial. He is entitled to another trial.

Other assertions of error are either so insubstantial as not to require discussion or are so unlikely to arise at a second trial as not to require comment.

Judgment will be entered vacating the judgment of the District Court, setting aside the verdict and remanding the case to that court for further consistent proceedings.