COMMONWEALTH *vs.* CHARLES E. TRACY.

Suffolk.    November 2, 1964. — April 26, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Evidence,* Descriptive words, Of hearing words, Verbal act, Of intoxication, Admissions and confessions. *Homicide. Witness,* Child. *Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel.

There was no error at the trial of a criminal case in admitting testimony of a nonexpert witness that he heard the "sound of a door being broken." [95–96]
At the trial of an indictment for murder of a police officer shot and mortally wounded by the defendant, there was, on the record, no reversible error in admitting testimony that a police sergeant, stationed near the door of a room in which the defendant and the wounded officer were after the shooting, loudly called out to the defendant in substance directions to throw his gun out and give himself up, saying that he and other officers there were "only interested in the wounded officer" [96]; nor was there error in admitting testimony of an officer that he heard the wounded officer say in the room "Come in; please come in" [96–97].
There was no error at the trial of a criminal case in a refusal by the judge to allow a thirteen year old girl to testify that in a telephone conversation with the defendant shortly before the commission of the crime she "asked him whether or not he was drunk." [97]
Evidence of the circumstances in which the defendant in a murder case broke into a bank at an early hour of the morning, armed himself with a revolver found there, concealed himself in a supply room, and, when one of several officers who had come to the bank in response to an alarm entered the supply room, shot and mortally wounded the officer warranted a finding of murder committed with deliberately premeditated malice aforethought and warranted a verdict returned by the jury of guilty of murder in the first degree; and judgment based on the ver-

dict was affirmed by this court [97–98]; WHITTEMORE, J., was of the opinion that on the record this court, in the exercise of its power under G. L. c. 278, § 33E, should reduce the verdict to murder in the second degree.

Where it appeared in a murder case that shortly after the defendant had shot and mortally wounded a police officer at an early hour of the morning the defendant, himself seriously wounded by police gunfire, was taken to a hospital at which he, without counsel of his being present and without his being informed of his constitutional right to remain silent, was briefly questioned by a police lieutenant and gave certain incriminating replies to questions, such interrogation in the circumstances was not made inadmissible in evidence at the trial by the Sixth Amendment of the Federal Constitution, as interpreted in *Escobedo* v. *Illinois,* 378 U. S. 478 [98–99]; WHITTEMORE, J., dissenting.

INDICTMENT found and returned on June 4, 1962.

The case was tried in the Superior Court before *Forte, J.*

*Frederick W. Harrington, Jr.,* for the defendant.

*Lawrence L. Cameron,* Assistant District Attorney, for the Commonwealth.

KIRK, J.   The defendant was tried and found guilty of murder in the first degree of John J. Gallagher.  The jury did not recommend that the death sentence not be imposed. G. L. c. 265, § 2.   The trial was made subject to G. L. c. 278, §§ 33A–33G, as amended.   Sentence of death was imposed, and execution of the sentence has been stayed.   G. L. c. 279, § 4.   The case is here on the defendant's appeal, which is accompanied by a summary of the record, a transcript of the evidence and the assignment of errors.   The alleged errors relate to rulings on evidence and to the denial of motions for directed verdicts.

We approach our consideration of the case having in mind the duty which devolves upon us by G. L. c. 278, § 33E, as amended by St. 1962, c. 453.   The broad scope of our responsibility under the statute, as amended, was fully expounded in *Commonwealth* v. *Baker,* 346 Mass. 107, 108–109, and need not be repeated.

The gravity of the offence, the sentence imposed, and the discharge of our duty under the statute move us to set out the evidence in detail.

The scene of the alleged crime was the basement of the Kenmore Square office of the National Shawmut Bank of

Boston (the bank) located at 542 Commonwealth Avenue, Boston. The bank is on the south side of the avenue, facing north. To the east it abuts upon a commercial building. To the west, there is a parking lot, also used by the bank's "drive-in" customers for whose convenience there are windows on the west side of the building facing the lot. To the rear of the building is an alley. The alley is L-shaped. The long leg of the "L" abuts upon the rear of the bank and upon the rear of adjoining buildings to the east. The short leg of the "L" runs perpendicularly from the west end of the rear of the bank to Newbury Street which runs generally parallel to the alley to the west end of the rear of the bank.

At approximately 4:30 P.M., closing time, on May 24, 1962, one Savage, a guard at the bank, went to his closet located on a landing of the main staircase leading from the main floor to the basement of the bank. The door to the closet, when closed, was flush with the wall of the stairwell. Savage removed his fully loaded (six cartridge) thirty-eight calibre Special Smith & Wesson revolver from the holster attached to his belt, and placed the revolver on the high shelf of the closet and covered it with some laundry and his uniform cap. It was "hidden." He then hung his belt on a hook in the closet, changed to civilian clothing, and left the bank.

At about the same time, between 4:30 P.M. and 4:45 P.M., the assistant manager of the bank adjusted the American District Telegraph Co. (ADT) alarm switch on the main vault and on the night deposit vault to the "on" position. Both vaults are in the basement. Both switches must be operated manually to actuate the alarm. There is no alarm system connected with the exterior doors or windows of the bank. When the assistant manager left the bank, the doors and the windows of the bank were secure. One of the windows, when viewed from the interior of the building, was nine feet above the floor of the ladies' room at the rear of the basement of the building. Viewed from the outside, the lower edge of the window was about a foot above the sur-

face of the L-shaped alley at the rear of the building. The window was visible from the intersection of Newbury Street and the short leg of the "L." The window was three feet high and two feet wide, made of glass interwoven with wire mesh set in a metal frame. When unlocked, it swung open horizontally on a swivel bar across its middle.

The cleaning man, who reported for work at 3:30 P.M., left the bank at 7 P.M. When he left, the premises, both main floor and basement, had been cleaned, the building was secure, and all lights were extinguished except one over the main stairway leading from the first floor to the basement. The door of the closet where the guard kept his gun, clothing, and so forth was closed. The cleaning man did not open it, and never had opened it on, before or since May 24, 1962.

At 2:39 A.M. on May 25, 1962, an alarm from the bank was received at the ADT office on State Street, Boston. An ADT guard, Gillette, armed, and wearing a uniform similar to that of Boston police officers, was immediately dispatched to the bank. Simultaneously, the Boston police were notified. When Gillette arrived at the bank at 2:48 A.M., several Boston police officers were already busy outside the bank. Officer Stanton, proceeding along the parking lot (west) side of the bank, noted lights on the first floor. At the rear of the building, using his flashlight, he saw that the window in the alley which opened into the basement ladies' room was smashed and open. The ladies' room was "well lit." In the meantime, Officers Gallagher (the deceased) and Cesero, who had arrived shortly after Stanton and before Gillette, proceeded together to check the outside of the building. While checking the doors and windows on the parking lot side of the bank, Cesero noticed a shadow moving in one of the teller's windows. Thereafter he saw the reflection of a man "from the neck down"; there was something in the man's right hand. After a few words, Gallagher left Cesero and went around to the front of the bank. Guard Gillette then arrived. He had the keys to the bank. He opened the front door and entered

the main floor accompanied by Officers Gallagher, Donelan and Vance. The main floor was searched but no one was found. The party then went to the basement which was a maze of utility rooms, small conference rooms, and cubicles for the use of depositors in the vaults. There were two narrow corridors in the basement, both of which ran north-south. One was referred to as the "east corridor"; the other as the "west corridor." The named officers searched the east half of the basement, and then proceeded to the steps leading to the door which opens on the alley at the rear of the building. They admitted Officers Madden and Stanton, and re-secured the rear door.

Then some shots rang out; that is, one shot, a very brief pause, and then two or three shots in rapid succession. The sounds came from behind a closed metal sheathed door which separated the place where the officers were standing from the supply room. Officer Gallagher was not with them. Gillette and the Boston officers moved through several rooms and reached the west corridor, at the south end of which there were two doors. On the west side of the corridor a door admitted to the ladies' room; on the east side there was an opening to the supply room. When Gillette and Donelan came to the opening to the supply room, they saw Gallagher lying on his back, his body parallel to the closed metal door. His right leg was "kind of bent up," "flexed," "upright," "raised." At this moment, Gillette was shot in the thigh. The shot came from a recess in the north wall of the supply room, against which were two long cabinets eighteen inches deep. The recess was formed by a space between the cabinets. In the space was a doorway between the supply room and a conference room. Gillette and Donelan then backed up along the west corridor. Officer Stanton saw "a colored man, about six feet two," standing in the doorway of the supply room pointing a gun at him. The man wore a short sleeve sport shirt. He did not appear to be injured in any way. Stanton fired at the man and backed into the ladies' room across the corridor. Officer Vance, standing with Officer Madden in

an alcove in the west corridor, saw, at the same time, a "light-skinned, colored male" standing at the door of the supply room with a gun clenched in his hand.

Sergeant Barry then arrived at the bank. He came through the open window in the alley. He conferred with Stanton in the ladies' room. Immediately, Sergeant Barry dropped to one knee and yelled or called out in a loud voice, through the partly opened door, three or four times over a period of ten minutes, with minor variations: "I am Sergeant Barry of the Boston Police. Put your gun out. Give yourself up. We are only interested in the wounded officer." When Sergeant Barry called out these words, he was five or six feet away, measured diagonally, from the opening to the supply room. His words were clearly heard and understood by officers who were at the other end of the west corridor, at least thirty feet away from Sergeant Barry.

During the period that Sergeant Barry was in the ladies' room, the bare arm of a "light skin colored male" appeared four times from the opening to the supply room, with a gun in his hand pointed down the west corridor. The gun was fired at least twice down the corridor. The officers returned the fire every time the hand appeared. The hand and gun were low, near the floor, perhaps a foot above it. The hand and gun appeared again, and the gun was pushed or slid along the floor of the corridor for a distance of approximately six to eight inches. The officers then emerged from their covered positions at the far end of the corridor. The hand thereupon suddenly reappeared from the supply room, snatched up the gun, and fired at the oncoming officers.

A tear gas shell was fired. Detective Cunningham went to the conference room adjoining the supply room. Through the closed door which separated the two rooms he heard Gallagher's voice, with which he was familiar, say, "Come in; please come in." The door was locked. Cunningham kicked open the door, saw Gallagher lying on his back, his right leg up, with gun in hand, pointed at the defendant.

Gallagher spoke to Cunningham and then became uncon-
scious. There was a red mark right in the center of his
white, regulation police shirt. Gallagher's gun was empty
of bullets. The defendant's gun was kicked out of his left
hand. The defendant was in a prone position, "lying on
his belly"; his body was partly out in the corridor; his
head was not touching the floor; his face was up, looking
down the corridor. He was wearing a gun belt, with hol-
ster, around his waist. All bullets in the gun had been
discharged.

Gallagher, Gillette and the defendant were taken to the
Boston City Hospital. Lieutenant Donovan of the homi-
cide unit, accompanied by a police stenographer, arrived at
the hospital at 4:30 A.M. Donovan was in civilian clothes.
After a delay of twenty minutes, he was admitted to a room
fourteen by twenty feet in area. The defendant was on a
stretcher. The questioning began at 4:55 A.M. Two doc-
tors "and probably a nurse" were in the room. Lieuten-
ant Donovan identified himself to the defendant. The
questioning lasted seven or eight minutes. The defendant
grunted or groaned two or three times and, when he did,
Lieutenant Donovan waited. The questioning in its en-
tirety is set out in the footnote.[1]

---

[1] LIEUTENANT DONOVAN: "What is your name?" A. "Charles Tracy."
Q. "Do you have a middle name?" A. "Edmund." Q. "How old
are you?" A. "36." Q. "Where do you live?" A. "536 Common-
wealth Avenue." Q. "Married?" A. "No." Q. "Who do you live with
there?" A. "My mother." Q. "What is her name?" A. "Lydia."
Q. "Do you work?" A. "Yes." Q. "Where?" A. "Kenmore Hotel."
Q. "What happened this morning?" A. "I don't know." Q. "The of-
ficers took you out of the Shawmut Bank?" A. "Yes." Q. "How did
you get in there?" A. "I don't know, through a door." Q. "Which
door?" A. "The back door." Q. "How did you get in the door?"
A. "Just walked through." Q. "Did you break the door open?" A. "No,
I didn't." Q. "Was the door open?" A. "Yes." Q. "What did you
do when you got inside?" A. "I just sat down." Q. "What did you
have with you, did you have anything on you?" A. "A gun." Q. "What
kind of a gun?" A. "A .22." Q. "A revolver?" A. "Yes." Q.
"Where did you get it?" A. "It was already in there." Q. "Where-
abouts was it in there?" A. "On a shelf." Q. "What did you do with
it?" A. "Nothing, I fired some shots." Q. "You fired some shots at
somebody?" A. "Yes." Q. "How many shots did you fire?" A. "One."
Q. "Which gun did you use to fire that shot?" A. ".22." Q. "Who
did you fire it at?" A. "I don't know." Q. "Did someone come in after
you?" A. "Yes." Q. "Who was that?" A. "An officer." Q. "Was

Officer Gallagher died at approximately 6 A.M. May 25, 1962. Dr. Luongo, medical examiner, performed the autopsy. There were two wounds of entrance; none of exit. The first wound was three inches below the left nipple. It "was a distant type gun shot wound, without the deposit of powder residue from the muzzle blast of the gun." This bullet, in its course through the body, perforated the aorta, the main blood vessel, so that a massive amount of blood escaped into the body, perforated the liver, stomach and small intestine, and then lodged next to one of the vertebrae. The second bullet entered the right leg, at the level of the knee joint, on the inner side of the knee, passed up the thigh, slithering along above the muscle and lodged near the groin at a point twelve and one-half inches from the point of entrance. Firing tests and comparative microscopic examinations of the two bullets removed from Gallagher's body disclosed that they had come from the bank guard's thirty-eight calibre Special Smith & Wesson revolver, which had been kicked from the defendant's hand in the supply room.

During the defendant's surgery, five bullets were removed from his body. Tests disclosed that three of these had been fired from Gallagher's thirty-eight calibre Colt police revolver. The other two bullets removed from the

he alone?" A. "Yes." Q. "Is that when you fired the shot?" A. "Yes." Q. "Did you fire it at the officer?" A. "I don't know." Q. "How do you know it was a .22?" A. "It was a short one." Q. "Was the light on in the bank?" A. "Yes." Q. "Who put the lights on?" A. "I don't know." Q. "Was the light on when you got there?" A. "Yes." Q. "Did you go into some room?" A. "Yes." Q. "What part of the bank were you in?" A. "In the inside near the door." Q. "In the rear or front of the bank?" A. "Rear." Q. "Just whereabouts was it, if you know?" A. "On a shelf." Q. "How did you get the belt and holster that you had on when you were brought in here?" A. "That was in the bank." Q. "Why did you put that on you?" A. "Oh, I — I don't know." Q. "That belt and holster belonged to a police officer?" A. "No, it don't." Q. "Why did you put it on you?" A. "I don't know." Q. "They found some checks on you." A. "Those were mine." Q. "Did you get them in the bank?" A. "No." Q. "Did you have them with you when you went into the bank?" A. "Yes." Q. "How did you happen to have them on you?" A. "I don't know." Q. "Do you have a checking account in that bank?" A. "Yes, I do." Q. "Do you have anything else to say as to what happened this morning?" A. "No." Q. "Is this statement you have given me been a true statement?" A. "Yes."

defendant were too distorted to permit positive identification. Of the three identifiable bullets, one was removed from the defendant's abdomen, one from his left leg, and one from his rectum. Of the two unidentifiable bullets, one was removed from his right wrist and the other from his left leg.

It was Dr. Luongo's opinion that the point of entry and the course of the bullet along Gallagher's thigh was consistent with it having been fired by a man who was standing while Gallagher was flat on his back with his right leg flexed.

The defendant took the stand. His testimony disclosed that he had worked in the vicinity of Kenmore Square for a number of years, that he was very familiar with the area, that for two years prior to May 24, 1962, he had lived at 536 Commonwealth Avenue and that he had used the alley in the rear of the bank a number of times. He had opened a checking account at the bank in April. He knew there was a deposit box somewhere in the bank. He remembered roaming around in the bank. He opened a door and saw a belt and holster with a gun. He had the gun in his hand. He heard someone tell him to throw the gun out, to come out and he would not be hurt. He was lying on his stomach. But he could not let go of the gun. He could not get it out of his hand.

We consider the assignments of error. Of these, assignment 6 has been waived.

There was no error in permitting Officer Donelan to testify that after the gas gun had been fired he heard the "sound of a door being broken." It has long been held that summary descriptions of things, if based on the sensory reactions of men in general and not requiring special learning or experiment, may be admissible as statements of observed facts. A witness "may state his opinion in regard to sounds, their character, from what they proceed, and the direction from which they seem to come." *Commonwealth* v. *Sturtivant,* 117 Mass. 122, 133, 137. *Commonwealth* v. *Moore,* 323 Mass. 70, 76, 77. *Kane* v. *Fields Cor-*

*ner Grille, Inc.* 341 Mass. 640, 647, and cases cited. There was no error (assignment 1).

Assignments 2, 3, 4, 5, and 7 related to the judge's rulings permitting several police officers to testify to what they heard Sergeant Barry call out or yell from the ladies' room. The testimony was admitted de bene. We do not rely on the fact that the defendant made no motion to strike the testimony (see *Commonwealth* v. *Johnson,* 199 Mass. 55, 59; *Commonwealth* v. *Sheppard,* 313 Mass. 590, 596, and cases cited) since other evidence made the evidence admissible. Sergeant Barry's relative proximity to the defendant and to the officers, as set out in the evidence, could raise in the minds of the jury the strong likelihood that, if the officers heard Barry's words, the defendant heard them also; the fact that the defendant did slide the gun into the corridor, although as a ruse, showed that he heard and understood the words; his testimony on the stand was an admission that he heard and understood the words spoken by Sergeant Barry and is conclusive of the issue. It was for the jury to consider what inference, if any, should be drawn from the defendant's response to Sergeant Barry's words. *Commonwealth* v. *Simpson,* 300 Mass. 45, 51. *Commonwealth* v. *Moore,* 323 Mass. 70, 77.

Assignments 9, 10, and 11 are based upon the defendant's exceptions to the admission of Sergeant Barry's testimony as to what he did say. These assignments are without merit in view of what we have already said with respect to assignments 2, 3, 4, 5, and 7.

Assignment 8 is based upon the defendant's exception to the admission of Detective Cunningham's testimony that, through the door of the supply room, he heard Officer Gallagher say, "Come in; please come in." The defendant argues that the testimony was inadmissible because there was no showing that the defendant heard Gallagher's words. Whether the defendant heard these words is altogether immaterial. Gallagher's words were a verbal act, an oral signal of distress to his brother officers, and plainly admissible. "[S]uch expressions are the natural and necessary

language of emotion, of the existence of which, from the very nature of the case, there can be no other evidence." Bigelow, J., in *Bacon* v. *Charlton,* 7 Cush. 581, 586. See Wigmore, Evidence (3d ed.) § 1718.

Assignment 13 concerns a restriction which the judge imposed upon the testimony given by a thirteen year old girl who said that she had a telephone conversation with the defendant during the "late show" on television on the night of May 24, 1962. The question asked was, "And how did he [the defendant] sound to you, Catherine?" The judge permitted the girl to answer, "He sounded funny; he didn't sound right." The judge declined to permit her to testify, as the offer of proof said she would, that she "asked him whether or not he was drunk." The judge was right on the ground, expressly stated, that he found the witness too immature to form an opinion by a telephone conversation whether the defendant was drunk.

Assignment 14 is based on the judge's denial of the defendant's motion for a directed verdict of not guilty of murder in the first degree. The motion was rightly denied. The evidence fully supported the conclusion implicit in the verdict of the jury: That the defendant murdered Officer Gallagher and murdered him with deliberately premeditated malice aforethought as that phrase has been used and applied in this Commonwealth for more than a century. *Commonwealth* v. *Webster,* 5 Cush. 295. *Commonwealth* v. *York,* 9 Met. 93. *Commonwealth* v. *Tucker,* 189 Mass. 457, 487. *Commonwealth* v. *Brooks,* 308 Mass. 367, 369, 370.[2]

Specifically, the jury could find on the evidence that the defendant having broken into a building, had armed himself with a deadly weapon. They could find that he was so

---

[2] "After the exhaustive discussion of this statutory phrase in *Commonwealth* v. *Tucker,* 189 Mass. 457, at pages 486–496, it would be superfluous to attempt further definition. We merely quote the summary of the court's conclusions as expressed by the court itself on pages 494 and 495 of that case: 'In substance . . . while it must be shown that a plan to murder was found after the matter had been made a subject of deliberation and reflection, yet in view of the quickness with which the mind may act, the law cannot set any limit to the time. It may be a matter of days, hours, or even seconds. It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds.' "

armed before any police officer, in the performance of his duty, had entered the bank. They could find that he so armed himself with the purpose of using the weapon to prevent his capture or to effect his escape. They could find that he had formed a judgment that the supply room was best adapted to achieve his purpose, in that it was accessible through one open door and had a recess between the large cabinets along the walls, affording concealment to him and observation of movements of others toward him. They could find that, as in the case of the wounding of Gillette, the defendant stationed himself between the cabinets and that, when Officer Gallagher entered the supply room, he deliberately fired the "distant" shot which proved mortal. They could reasonably infer from the evidence that Gallagher advanced, returned the fire with a bullet to the defendant's abdomen and then slumped to the floor on his back near the metal door. They could find that when Gallagher was on his back the defendant with deliberate premeditation fired the bullet which coursed along the inner aspect of Gallagher's right thigh from the knee to the groin. The physical facts warranted the inference that, when the defendant was in the prone position pointing his gun down the west corridor at the other officers, Gallagher, still on his back, fired the bullet which entered the defendant's rectum.

Since the verdict of guilty of murder in the first degree was clearly warranted, it is unnecessary to discuss the denial of the motion for a directed verdict of not guilty of murder in the second degree (assignment 15).

The defendant argues further, however, under assignment 12, that Lieutenant Donovan's testimony of his interview with the defendant at the Boston City Hospital at 4:55 A.M. on May 25, 1962, was inadmissible. He relies upon *Escobedo* v. *Illinois,* 378 U. S. 478, decided after the trial of the case. We do not read the *Escobedo* case as requiring or indicating a reversal of the judgment in the case before us.

The majority opinion in the *Escobedo* case was careful to point out that the decision was limited to the circumstances

of the case. 378 U. S. 478 at 479, 490–491. The aggravating factors with which the court was concerned there (see 378 U. S. 478 at 490–491) are not present in the case at bar. The ascertainment of the defendant's identity required that he be questioned as soon as possible. The whole interview was brief and simple. The defendant was treated with consideration and with an awareness of his physical condition. A violation of the defendant's right to counsel under the Sixth Amendment to the United States Constitution is not shown. Nor did the fact that the defendant made the statements while in a wounded state require their exclusion. See *Commonwealth* v. *Harrison,* 342 Mass. 279, 284–285. The testimony concerning the interview was admissible and the defendant's assignment 12 shows no error.

The jury obviously rejected as incredible the defendant's repeated statements at critical points in his testimony that he was "floating" as the result of drinking a grape flavored concoction at his work in the evening of May 24. It is difficult to see how it could be viewed as other than incredible. *Commonwealth* v. *Payne,* 307 Mass. 56, 58. We adopt the jury's view.

There was no exception to the judge's charge. It was accurate, complete and fair.

Upon consideration of the whole case we are convinced that the verdict of the jury was eminently just. *Commonwealth* v. *McNeil,* 328 Mass. 436, 442.

*Judgment affirmed.*

WHITTEMORE, J. (dissenting) The Commonwealth does not contend that Tracy was in the commission or attempted commission of a crime punishable with death or imprisonment for life. G. L. c. 265, § 1. Hence, a finding of deliberate premeditation was necessary for the conviction of murder in the first degree.

1. The interrogation of Tracy at the hospital by Lieutenant Donovan supplied the only direct evidence of the shooting of Officer Gallagher. At the time Tracy was seriously wounded and appeared to be in pain. Five bullets

were removed from his body, one each from his abdomen, right wrist and rectum and two from his left leg.

The propriety of the interrogation of Tracy at the time and under the circumstances is not at issue. I agree with the majority that it was appropriate and necessary. But a new construction by the Supreme Court of the United States, made after the trial of Tracy, has, as it appears to me, shown that the examination was inadmissible at the trial. Tracy, in the interrogation, admitted that he fired the gun when an officer who was alone came in after him. This was significant and of course damaging evidence on the issue of premeditation.

*Escobedo* v. *Illinois,* 378 U. S. 478, 491, as I read it, shows that admissions obtained from a prime suspect by a process of police interrogation that "lends itself to eliciting incriminating statements" may not be used at his trial if before the examination is begun he is neither informed of his constitutional right to remain silent nor given the opportunity to consult an attorney. If in a given case the accused has full awareness of his right to be silent, the police need not inform him of the right, and, of course, the accused may waive his rights. This construction finds support in holdings and opinions elsewhere. See *People* v. *Dorado,* 62 Cal. 2d 338, *State* v. *Hall,* 88 Idaho, 117, 129–131 (concurring opinion); *State* v. *Neely,* 239 Ore. 487; *State* v. *Dufour,*     R. I.     ,    —    ;[1] *Davis* v. *North Carolina,* 339 F. 2d 770, 780–783 (4th Cir.) (dissenting opinion); dissenting view of Desmond, C.J., and Fuld, J. in *People* v. *Gunner,* 15 N. Y. 2d 226, 233. But see *Davis* v. *North Carolina,* 339 F. 2d 770 (4th Cir.); *People* v. *Hartgraves,* 31 Ill. 2d 375, 379, cert. den, sub nom. *Hartgraves* v. *Illinois,* 380 U. S. 961; *Bichell* v. *State,* 235 Md. 395, 399; *Bean* v. *State,* 81 Nev.     ;[2] *People* v. *Gunner, supra.*

The right to remain silent and the duty of the interrogating police to advise the suspect thereof is the basis of the opinion in *State* v. *Neely,* 239 Ore. 487. For other cases showing that this Federal constitutional right is ap-

[1] 206 Atl. 2d 82, 83–85.

[2] 398 P. 2d 251.

plicable to the State, see *Malloy* v. *Hogan, Sheriff,* 378 U. S. 1, 6, 8; *Fagundes* v. *United States,* 340 F. 2d 673, 677 (1st Cir.); *Haynes* v. *Washington,* 373 U. S. 503, 510–511; *Crooker* v. *California,* 357 U. S. 433, 438, 440. See also *Commonwealth* v. *Beaulieu,* 333 Mass. 640, 651 (right is recognized in the Uniform Code of Military Justice).

The right to the advice of counsel where the prime suspect does not know his other relevant rights and is about to be interrogated cannot depend, as I see it, upon whether the suspect happens to ask for counsel. The *Escobedo* opinion does not state such an arbitrary rule. "[T]he imposition of . . . [such a] requirement . . . would discriminate against the defendant who does not know his rights." *People* v. *Dorado,* 62 Cal. 2d 338, 351. "[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." *Carnley* v. *Cochran, Corrections Director,* 369 U. S. 506, 513.

There was coercion of Escobedo. There was plainly no coercion of Tracy. But the *Escobedo* principle does not appear to be founded in coercion. Had that been determinative, the case, semble, would have been decided under the Fourteenth Amendment without reference to the Sixth Amendment. See, for example, *Haynes* v. *Washington,* 373 U. S. 503.

Tracy was not informed of his constitutional rights. In his condition, such advice was especially important and no waiver should be presumed.

2. The evidence furnishes no fully satisfactory explanation of the presence of Tracy in the bank building or his conduct there. The testimony of the officers showed that the lights in the basement of the bank were on when the officers arrived. Tracy testified that he had turned on all the switches. There is no suggestion that anyone else could have done so. Gillette found that the alarm switch had been moved from its regular position at the time of closing the bank. The reasonable inference is that Tracy moved the alarm switch in the course of turning the light switches.

There is no suggestion that any attempt was made to break in the safe or that Tracy had with him any tools of any kind.

The jury of course could draw the very reasonable inference that Tracy entered the bank to steal money, but the absence of bank robbing tools, and, initially, of a weapon, the turning of switches so that the presence of an intruder was signalled by lights and an alarm, and Tracy's foolhardy conduct with the gun notwithstanding the presence of several officers,[3] suggest the opposite of planning or of forethought and premeditation.

Tracy's own story is in substantial part fantastic and improbable. It could of course have been found to be incredible.[4] By itself it reads like a cock and bull story to escape responsibility for a shocking murder. But in the single aspect in which it is important, that is, premeditation, it must be read with the officers' testimony and with the testimony of other witnesses. Several witnesses testified to having seen or talked with Tracy in the course of the evening and, in substance, that he looked, acted or talked "funny" or "strange" or not "like himself," with "a dead stare" and that he walked "very rigid," "real stiff and straight."

---

[3] The testimony of the officers was to the effect that, when Sergeant Barry shouted orders to the intruder to put the gun down and surrender, a gun was slid along the floor from the supply room to the corridor or was dropped to the corridor floor from an arm protruding from the supply room. As the officers proceeded up the corridor toward the supply room, a hand reached out from that room and retrieved the gun which was then fired at the approaching officers.

[4] Tracy testified that, sometime earlier in the evening, a chef at a restaurant on Boylston Street, where Tracy was employed as a broiler cook, gave him what appeared to be a grape flavored soft drink. He immediately craved more; after five or six glasses his mouth and mind became numb, he felt "like . . . [he] was floating," he felt "real strange." He described going to two restaurants, taking a cab, going to his apartment, talking with his wife, going out for ice cream, and eventually finding himself in a building (the bank) where he roamed around and turned all the light switches. Throughout this period he felt the same way, "floating" and his "mind . . . blank." While in the building he heard voices and became frightened. He opened the door of a locker and saw a gun belt with holster and gun and, being "real scared," he put it on. He started to run upstairs, but hearing loud and angry voices behind him, ran down again and into a little room, still feeling as if he were floating; he climbed to the top shelf in a cabinet, and heard gunfire and the command to throw the gun out and come out. He took hold of the gun and them got hit and fell to the floor and the gun went off several times when bullets hit his hand.

This was an important aspect of the case for the consideration of the jury in determining whether to find Tracy guilty of first degree murder. The testimony tending to show that Tracy's murderous action was impulsive and planless, particularly the testimony of the officers, warranted reference in the charge. That such reference was not made is of course not legal error. Undoubtedly if there had been a request to refer to this testimony the judge would have done so. As the case has come to us, we are not obliged to give the matter any consideration. *Commonwealth* v. *Bellino,* 320 Mass. 635, 645–646. But we may do so in connection with the exercise of our extraordinary powers under G. L. c. 278, § 33E.[5]

The judge, in respect of second degree murder, noted that Tracy contended that his mind was blank and that he did nothing of which he was conscious, and charged, rightly, that if Tracy did not know what he was doing he was not guilty of murder, but if he was conscious of what he was doing he was guilty of murder in the second degree. There was no mention of the officers' testimony. Of course, the critical alternatives in respect of first degree murder were conscious premeditated action and conscious unpremeditated action. Tracy's own testimony was that he was aware of what was happening.

Undoubtedly an inference of deliberate premeditation was warranted. But the evidence permitted another inference. To me, in view of the reliable account of the officers of what they observed, it is a strong inference. Hence, I believe that the submission of the case to the jury without a reference thereto warrants notice on this appeal.

3. I would reverse the verdict of murder in the first degree because of the introduction in evidence of the hospital interrogation. Failing in that, and for two additional rea-

---

[5] General Laws c. 278, § 33E, as amended by St. 1962, c. 453, provides, in part: "Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt . . .."

sons, I would reduce the verdict to murder in the second degree. These reasons are (1) the striking divergence in the views of courts and judges as to how the *Escobedo* case should be construed — a divergence that can be resolved only by a decision of the Supreme Court of the United States; and (2) the submission of the issue of first degree murder without express reference to the police testimony and the other testimony tending to show impulsive conduct.