No. 46,817

State of Kansas, *Appellee*, v. Heidi Sue Garcia and Vernon Eugene Bell, *Appellants*.

(504 P. 2d 172)

Opinion filed December 9, 1972.

*Richard H. Seaton*, of Everett and Seaton, of Manhattan, argued the cause and was on the brief for the appellants.

*Larry B. McGrath*, county attorney, argued the cause, and *Vern Miller*, attorney general, and *James W. Morrison*, assistant county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: On the night of July 31, 1971, Captain Leo Regier and Detective Al Helfferich of the Manhattan Police Department were on stakeout at the municipal parking lot at Third and Houston Streets. For some time the parking meter collections from that lot had been coming up short and the officers were there to find out why.

They had come on duty at 9:30 p. m., and were scheduled for a four hour shift. Their vantage point was a second story window over Green's Book Store, from which they had a clear view of the well lighted lot across the alley. Their vigil was going into its second hour when their attention was drawn to a car parking at the northwest corner of the lot. Its occupants were two men and a woman with a small child.

It was several minutes before one of the men got out of the car, went to the trunk and brought back a bottle. The three adults partook, and the bottle was replaced in the trunk. Then, before the unseen but watching eyes of the officers, one of the men approached the nearest meter and placed his hands upon it, one about where the lock would be and the other slightly below. He shortly removed them and returned to his companions who were leaning against the car.

The trio—or quartet, if one includes the baby—went in a group to the next meter east, but there just lounged about while shoppers passed by in the adjacent alley. Next, they set course to the west edge of the lot and thence due south to the meter at the southwest corner. There they surrounded the meter while the two-hand grip was repeated; this was followed by a movement to the large straw handbag carried by the woman. The next meter east received the same careful attention, but as they approached the third in the line they encountered passers-by. At this point the baby was tossed and passed from hand to hand while the group moved on to the far east end of the lot. The meter there received the familiar treatment —one hand at the lock and one below, motion to the handbag—as did the next four meters coming back to the west.

By now the watching officers had seen and heard enough—Detective Helfferich had heard the clinking of coins—and they moved out of their observation post. Helfferich went into the bookstore and telephoned for help, while Captain Regier went out onto the lot to make the arrest. At his approach the woman and one of the men moved away toward their car, leaving the meter-gripper standing alone by a meter. Regier identified himself and placed the abandoned one under arrest. He was found to be Thomas Russell Crow.

Crow was shepherded over to the car where by now his companions were seated in the front seat. They were identified as Heidi Sue Garcia, who was sitting in the middle of the front seat, and Vernon Eugene Bell, who sat next to the right door. The baby was Mrs. Garcia's.

The summoned help arrived about this time, in the form of Lieutenant Alvin Johnson and seven other Manhattan police officers. Crow was frisked by the right rear fender. Bell was asked to step out and he, too, was frisked. Mrs. Garcia was asked for her handbag. This she demonstrated to be completely empty—no money, no billfold, no Kleenex, no comb, no cosmetics, no letters—nothing.

Captain Regier briefed Lieutenant Johnson on the events of the evening and his observations. He had noticed an open bag or satchel on the floor on the driver's side and asked Lieutenant Johnson to see about it. Johnson peered in with a flashlight and observed the bag. It was partially unzipped, and he could see change in the bag. Inquiry revealed that Bell owned the car, but he refused to consent to its search. Johnson nevertheless removed the bag. Mrs. Garcia protested, saying it was her baby's piggy bank. Asked if it contained quarters she said, "Why, sure." Crow told her at this point not to say anything—that they would make bond and leave.

A later count of the contents revealed $32.00 in dimes, $27.75 in nickels, and thirty-nine pennies—all coins commonly recognized as "parking meter money." No quarters were found.

From the officer's point of view the only missing element in their case was a key or other instrument for opening the meters, for none showed pry marks or other evidence of tampering. The search of Crow and Bell had turned up no key, nor did an intensive search of the area. It occurred to them that Crow might have managed to slip it into the crevice between the car's trunk and the fender by which he had been searched. Lieutenant Johnson secured the keys from the ignition and opened the trunk. No key was found, but among the usual car-trunk miscellany was a small bag containing a set of files, a soldering iron, and, most significantly, a number of money wrappers of the type used by banks. These were designed for rolls of dimes, nickels and pennies.

The result was a misdemeanor charge of theft against each of the three adults. (The baby's fate is unclear.) They were jointly tried to an agreed upon six man jury, and each was convicted. Bell and Mrs. Garcia have appealed; Crow did not appear in person, was tried *in absentia,* and is not a party to this appeal.

Appellants' first and primary claim of error relates to the admission into evidence of the two bags and their contents taken from the car. They made a pretrial motion to suppress and renewed their objection at trial, claiming both bags were the result of an illegal search and seizure.

As to the bag taken from the front seat, we note that it was observed without entering both by Captain Regier and Lieutenant Johnson. As to it there was thus no "search," even though Johnson used a flashlight. *State v. Karney,* 208 Kan. 677, 494 P. 2d 1204, Syl. ¶ 6; *State v. Frizzell,* 207 Kan. 393, 485 P. 2d 160; *State v.*

*McMillin,* 206 Kan. 3, 476 P. 2d 612. The following discussion, then, is directed largely to the bag containing money wrappers taken from the trunk. Appellants' argument is that a warrantless search can only be justified if made in strict compliance with our only statute dealing with the subject, K. S. A. 1971 Supp. 22-2501:

"When a lawful arrest is effected a law enforcement officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of (*a*) Protecting the officer from attack; (*b*) Preventing the person from escaping; or (*c*) Discovering the fruits, instrumentalities, or evidence of the crime."

The area permitted to be searched by the statute is that within the arrested person's "immediate presence." *Chimel v. California,* 395 U. S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034, puts a gloss on that term of constitutional dimensions. The court there analyzed the traditional justification for a "search incident to arrest," and formulated limitations on its scope, in the following terms:

". . . When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—*construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."* (395 U. S. at 762-3. Emphasis added.)

What *Chimel* suggests, especially in the italicized language above, is that some of our past language in automobile search and seizure cases may have been too sweeping; in cases where the search must be justified *solely as incident to an arrest,* it is doubtful that officers may search a locked car trunk which is and has for some time before the arrest been clearly beyond the reach of the arrestee. Cf., *State v. Blood,* 190 Kan. 812, 818, 378 P. 2d 548; *State v. Caldrone,* 205 Kan. 828, 473 P. 2d 66; *State v. Hunt,* 198 Kan. 222, 424 P. 2d 571; *State v. Wood,* 197 Kan. 241, 416 P. 2d 729.

In each of these cases, however, whether articulated in the opinion or not, there existed an independent ground for searching the trunk; that ground was "probable cause" to believe that it contained the

fruits, instrumentalities or evidence of a crime. The *Chimel* court itself took express note that such probable cause may justify a warrantless search:

"Our holding today is of course entirely consistent with the recognized principle that, assuming the existence of probable cause, automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' *Carroll v. United States,* 267 U. S. 132, 153 [69 L. Ed. 543, 551, 45 S. Ct. 280, 39 A. L. R. 790]; see *Brinegar v. United States,* 338 U. S. 160 [93 L. Ed. 1879, 69 S. Ct. 1302]." (*Chimel v. California,* supra, f. n. 9.)

This theme was later developed and definitively expounded in *Chambers v. Maroney,* 399 U. S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975. We recently noted the import of that case in *State v. Undorf,* 210 Kan. 1, 7, 499 P. 2d 1105:

". . . [I]n *Chambers v. Maroney,* supra, the court made clear that the same knowledge providing probable cause for an arrest may also furnish probable cause for a search. Referring to *Carroll v. United States,* supra, the Court said (399 U. S. at 49):

" 'The Court also noted that the search of an auto on probable cause proceeds on a theory wholly different from that justifying the search incident to an arrest:

" ' "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." 267 U. S., at 158-159.'

"The upshot is that if there is probable cause to search a car such search need not be 'incidental to' or 'contemporaneous with' an arrest, but may be made wholly independently of any arrest at all."

We have applied this principle and expressly approved vehicle searches made on probable cause in such cases as *State v. Blood,* supra; *State v. Frizzell,* 207 Kan. 393, 485 P. 2d 160; *State v. Robinson,* 203 Kan. 304, 454 P. 2d 527; *State v. Ayres,* 203 Kan. 376, 454 P. 2d 534; *Metcalf v. State,* 199 Kan. 800, 433 P. 2d 450; and *State v. Brown,* 198 Kan. 473, 426 P. 2d 129.

Appellants recognize the principle, and concede that the officers here had probable cause to search the car. They seek to avoid the force of these authorities by arguing that the legislature has now addressed itself to the subject of warrantless searches, and by enacting K. S. A. 1971 Supp. 22-2501 has occupied the field. The constitution, they say, may permit warrantless searches of vehicles both as "incident to an arrest" and on "probable cause," but the Kansas legislature has specifically authorized only the first.

They would have us draw from this a negative inference that the legislature intended to forbid all other types of warrantless searches, even though constitutionally permissible. Under this theory presumably even a warrantless search made with the willing consent of the owner of the car or premises searched would be forbidden, for such a search is likewise not specifically sanctioned by the statute.

We are unable to reach such a drastic conclusion from the simple legislative act of codifying the developing body of case law relating to searches incident to an arrest. As the draftsmen of the section noted, "It states a proposition of general law." (Judicial Council note, 1969.) The same source indicates that the section was taken from an Illinois statute. The courts of that state have assumed without discussion that the presence of the statute in their code does not prevent their officers from making other types of constitutionally permissible searches. See *e. g., The People v. Georgev,* 38 Ill. 2d 165, 230 N. E. 2d 851; *The People v. Robinson,* 40 Ill. 2d 453, 240 N. E. 2d 630; *People v. Herbert,* 131 Ill. App. 2nd 518, 268 N. E. 2d 205; *People v. Ricketson,* 129 Ill. App. 2d 365, 264 N. E. 2d 220.

Appellants analogize this case to *Aiuppa v. United States,* 338 F. 2d 146 (10th Cir. 1964) where it was held the federal game management agents went beyond the scope of their statutory authority in searching a car trunk on probable cause. That case turned, however, on the fact that the agents were "special enforcement agents," enforcing only a limited area of the law, and with only such law enforcement powers as were specifically delegated by the applicable federal statutes. (*Id.,* p. 148.) We are not dealing here with law enforcement officers of such limited authority but with general police officers. For that reason we do not find *Aiuppa* persuasive.

We believe our own statute was intended only to furnish guidelines to officers and courts as to one method of making a valid, warrantless search. We hold that it does not prohibit other warrantless searches which comport with the constitutional requirement of reasonableness.

In this case, it is not clear that the trunk was inaccessible to the arrestees. Crow had been leaning on a rear fender when searched, and there had been several minutes when the activities of Bell and Mrs. Garcia were not carefully observed. This was

the time, before Lieutenant Johnson and company arrived, when Captain Regier arrested Crow while the other two made their way to the car. The elusive key could not be found, and the officers suspected that it had been secreted in the trunk. Since the arrestees had had an opportunity to do the secreting, we cannot say that a search of the trunk was not properly incident to the arrest.

It follows that the search of the automobile made here, made either as incident to the arrest or on conceded probable cause, was not unreasonable. Its fruits were therefore properly admitted into evidence.

Appellants raise one other issue, and that is the admissibility of Crow's statement to Mrs. Garcia that she shouldn't say anything to the officers. In this court it is claimed that this was a claim of constitutional privilege which the state was using as substantive evidence of the defendants' guilt, contrary to the admonition of *Miranda v. Arizona*, 384 U. S. 436, f. n. 37, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3rd 974; and our own holding in *State v. Bowman*, 204 Kan. 234, 461 P. 2d 735; and *State v. Dearman*, 198 Kan. 44, 422 P. 2d 573. Cf. *Griffin v. California*, 380 U. S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *Chapman v. California*, 386 U. S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

As we read the record this claim is being made here for the first time. The state sought to introduce testimony as to Crow's statement through two witnesses. The first attempt, which was through Captain Regier, was unsuccessful. The exchange was as follows:

"Q. Did you hear any conversation among the three whatsoever?

"A. The only conversation I heard is when—

[Defense Counsel]: Your Honor, I object to any testimony concerning statements by Mr. Crow since he is not present.

THE COURT: Well, you may state whether or not what you were about to relate was spoken by either of the defendants who are present or spoken by anyone in their presence and hearing.

"A. Mrs. Garcia started to say something and Mr. Crow stopped her by making a statement.

THE COURT: Go ahead.

"Q. What conversation did you hear?

"A. The conversation, I didn't hear what she said after Mr. Crow said be quiet.

[Defense Counsel]: I object to anything that Mr. Crow said since he is not present."

The state abandoned the effort at this point, and tried again through Lieutenant Johnson:

"Q. Did you hear the conversation between Capt. Regier and her concerning the type of money in the bag?

"A. I heard Capt. Regier inquire of her whether there were quarters in the bag. I didn't hear her answer, I heard Mr. Crow advise Mrs. Garcia not to say anything.

[Defense Counsel]: I object to anything Mr. Crow said.

THE COURT: State whether or not the statement you heard Mr. Crow make was in the presence of Bell and Garcia.

THE WITNESS: That is correct. We were standing on the south side of the vehicle, all three defendants were and the baby were on the south side of the vehicle standing up near the area of the vehicle and they were all three present and within hearing distance.

THE COURT: The objection is overruled. You may proceed.

"Q. [By the prosecutor] What did you hear Mr. Crow say?

"A. Mr. Crow advised Mrs. Garcia not to say anything, that they would get bond and leave."

As may be seen, the two objections to Regier's testimony and the one to Johnson's were all based on the fact that Crow was not present at the trial, *i. e.*, that the testimony was hearsay. That objection was not good because Crow's "statement" was not offered "to prove the truth of the matter stated," and was therefore not hearsay. (K. S. A. 60-460.) Nowhere does it appear that an objection was made in the trial court on constitutional grounds, and the constitutional question is therefore not properly before us. K. S. A. 60-404; *State v. Darling,* 208 Kan. 469, 493 P. 2d 216, Syl. ¶ 5; *State v. Karney,* 208 Kan. 677, 494 P. 2d 1204, Syl. ¶ 3.

If the question were here we would be hard put to find error, much less prejudicial error. The officers were recounting in narrative fashion the circumstances of the offense and the arrest, and the statement made by Crow was an event constituting part of the transaction. The situation is akin to that in *Fagundes v. United States,* 340 F. 2d 673 (1st Cir. 1965), described by the court as follows (p. 676):

"The arresting officer in the course of describing Fagundes's arrest testified that when he flushed Fagundes out of Mrs. Poulos's closet he announced 'you are under arrest in connection with the armed robbery of the Brookline Trust Company.' The officer then added that he asked Fagundes what he had to say, to which Fagundes replied that he did not want to say anything but wanted to see a lawyer. This testimony related directly to the appellant's arrest and was descriptive of that event. It was not even specifically objected to. Its admission was not error."

Here there was an objection, but as noted, only on hearsay grounds. In addition, the appellants were themselves asserting no right of silence. Rather, it was Crow who was advising Mrs. Garcia

as to the course *he* thought she ought to take. Any reaction of appellants to this advice, one way or another, does not appear to have been communicated to the jury. Under these circumstances, and in view of the convincing evidence of guilt recited above, we cannot believe that this testimony contributed to the verdict against them. Hence, if its admission was error, it was "harmless beyond a reasonable doubt." (*Chapman v. California,* supra, 386 U. S. at 24. See, also, *Harrington v. California,* 395 U. S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.)

The judgment is affirmed.

APPROVED BY THE COURT.